## Case No. 8,841.

### McKAY v. CARRINGTON.

[1 McLean, 50.] [1]

Circuit Court, D. Ohio. Dec. Term, 1829.

REAL PROPERTY—CONTRACT TO CONVEY—INSTALMENTS — FAILURE — DECREE FOR SALE — TITLE TRUSTEE FOR PURCHASER—ADMINISTRATOR.

1. Martin purchased a tract of land in Ohio, of Carrington, of Virginia, to be paid for by instalments. On the failure of any of the payments, Carrington, by giving notice and paying into the Bank of Virginia, his heirs, executors or administrators, had a right to annul the contract.

2. This contract, except by consent, can be annulled in no other manner than the one pointed out.

3. During his life C. treated the contract as binding, and his administratrix after his decease, obtained a decree for the money, and sold the land, and became the purchaser at the marshal's sale. She could only purchase Martin's equity.

4. Where a contract for the sale of land is void, or cannot be enforced by reason of laches on the part of the vendee, on the death of the vendor the land descends to his heirs.

5. Where an estate is contracted to be sold, equity considers it as converted into personalty. In such case the vendor is a trustee for the purchaser.

[Cited in Smith v. Babcock, Case No. 13,009.]

6. The complainant purchased the land, and paid a part of the purchase money; failed to get possession, which was held by purchasers under Martin. Decree pro confesso by the administratrix against the heirs of her dec'd husband, one being a minor, for the title. No proof that all the heirs were included. A delay of seven years and more before the tenants of Martin were ejected, and the title under the decree was tendered. The property decreased nearly fifty per cent. in value, and on these grounds a rescission of the contract was decreed, and the repayment of the money with interest. The circumstances of this case are materially different from a common bill for the rescission of the contract and damages.

[Cited in Cooper v. Brown, Case No. 3,191; Warner v. Daniels, Id. 17,181; Davis v. Read, 37 Fed. 424.]

[Cited in Merchants' Bank v. Thomson, 55 N. Y. 15; Hoyt v. Tuxbury, 70 Ill. 339. Cited in brief, Mastin v. Grimes, 88 Mo. 479.]

7. To obtain a rescission, it is not necessary to pay the whole of the purchase money.

8. That the notes given are negotiable and outstanding, is a reason why chancery will interpose its powers.

[Cited in Pierpont v. Fowle, Case No. 11,152.]

———

[1] [Reported by Hon. John McLean, Circuit Justice.]

[This was a bill in equity by Jesse McKay against Elizabeth J. Carrington.]

Creighton & Bond, for complainant.

Mr. Scott, for respondent.

OPINION OF THE COURT. This controversy arises on a contract dated the 13th December, 1817, by which the defendant, a resident of Virginia, sold to the complainant 2367 acres of land in two tracts, in Ohio, which the defendant had purchased under a decree of this court against Samuel G. Martin. Martin had purchased the land of Edward Carrington, deceased, in his life time, the husband of the defendant; but had paid only a small part of the consideration money. To compel the payment of the balance a suit in chancery was brought by the defendant, as administratrix of her husband's estate, and the land was ordered to be sold. The complainant was to pay for the land ten thousand dollars; the first payment of three thousand dollars to be made immediately; the second, of three thousand one hundred and fifty dollars and fifty cents the 1st January, 1819, and the balance the 1st January, 1820. And if the complainant failed to make payment, the defendant had the right to sell the land under a decree of court for the balance of the purchase money, the surplus, if any, to be paid to the complainant. There being no provision in the contract that the complainant might enter into the possession of the land, he alleges that he obtained a writing from the defendant authorizing him to take possession; but that he was unable to do so, as possession was held by various persons under Martin. This operated, it is alleged, greatly to the injury of the complainant, and he had no means of maintaining an action at law for the recovery of the possession. The bill further states, Edward Carrington left several heirs, some of whom are yet not of age. That the complainant at the instance of the defendant, or with her approbation, advanced three hundred and twenty-four dollars to pay expenses incurred by her in prosecuting suits in the circuit court to perfect her title to the land. It appears from the proof, that the land has greatly deteriorated in value, and on that ground connected with the lapse of time and the inability of the defendant, even on the filing of the bill, to make a clear title, he prays the contract may be rescinded, and the money paid, with the sum paid for costs, may be decreed to him, with interest; and that the land may be ordered to be sold for the payment thereof. The defendant in her answer states, that the purchase was made by the complainant, with a full knowledge of the state of the title. That she made no representations to mislead him, and that all the facts relating to the land and the title were as well known to the complainant as to herself. That she has not attempted to coerce the payment of the money, but has brought an ejectment and recovered judgment against the persons in possession under Martin, and had them turned out of possession. And that so soon as she could ascertain the residence of all the heirs of her deceased husband, she caused a bill to be filed against them in the county where the land lies, and obtained a decree of the court of common pleas for a title; and that she is now ready and willing to make a deed for the land, on the payment of the balance of the purchase money. It appears that a part of the land was taken possession of by the complainant, and that, for some time he received the rents and profits thereof; and then declined receiving them, as he did the entire possession of the land after the recovery of it under the suit in ejectment.

The first question which may be considered as arising out of the foregoing facts is, whether a court of chancery, under all the circumstances of the case, would, at the instance of the vendor, decree a specific execution of this contract. It is contended that Martin having failed to comply with his contract, for the purchase of the land; the estate both equitable and legal, on the decease of Carrington, descended to his heirs; and consequently the administratrix, who represents the personalty only, had no control over the contract. This contract was entered into the 11th October, 1805. The purchase money amounted to three thousand five hundred and fifty dollars and fifty cents, to be paid by Martin as follows: fifty dollars in hand, one thousand dollars the first of May ensuing, and the balance on or before the first May, 1807; the said Carrington, his heirs, &c. to retain the title in the land until the payment of the purchase money, and then he was to convey the land in fee simple by special warranty. Should Martin fail in making any one of the payments, Carrington, his heirs, executors or administrators, had the option, at any time thereafter, to annul the bargain by giving notice thereof and paying into the Bank of Virginia, on account of said Martin, his heirs, &c., any sum or sums of money without interest, which had been paid on the purchase. There is a receipt on the agreement for the payment of fifty dollars, and one for five hundred dollars, dated 30th March, 1807. Thirty dollars, it seems, were sometime afterwards loaned by the vendor to Martin, which was endorsed on the contract. Carrington died, on or about the 29th October, 1810.

The principle laid down by the counsel for the complainant is correct, that where a contract for the sale of land is void, or cannot be enforced, on account of laches in the vendee, on the death of the vendor the land descends to his heirs, and the contract is not considered as forming a part of the personal estate which goes to the executor or administrator. By the contract under consideration, Carrington, in his lifetime, had the power expressly to annul it; as there was a failure to make the payment, it seems he did

not think proper to exercise the power, but nearly two years after the second payment became due, he received from Martin five hundred dollars in part of it. This is conclusive that on the 30th March, 1807, the contract was considered by Carrington as of binding force; and until the day of his decease he failed to put an end to it in the mode provided. His administratrix had the same power as the deceased in his life time to annul the contract, by giving notice and repaying the moneys received. This she did not do, but on the contrary treated the contract as if it were in full force; and called upon a court of equity to decree a specific execution of it. When an estate is contracted to be sold, equity considers it as converted into personalty. And this is the case, although the election to purchase rests merely with the purchaser. 7 Ves. 436. Equity considers things agreed to be done as performed. The vendor is viewed as a trustee for the purchaser of the estate sold, and the purchaser as a trustee of the purchase money for the vendor; consequently the purchase money goes to the executor or administrator of the vendor, and the interest of the vendee descends to his heirs. As Carrington in his life time had given no indication of an intention to annul the contract, and as he had the power to do so, in a mode expressly provided; and as he received a part of the purchase money, after he had a right to put an end to the contract, no doubt can exist that he considered it in full force. If in the contract a particular mode is provided, by which a party may rescind it, as in the present case, by giving notice and repaying the money received, it can only be done in the mode provided. The repayment of the money by express agreement, is a condition precedent to the rescission of the contract, and must be so considered in equity as well as at law. This step not being taken, may be considered as indicating a determination to enforce the contract, and an acquiescence in the delay of payment. The equity of Martin, therefore, was not extinguished at or before the decease of Carrington. This being the case, there can be no doubt that the purchase money went to the administratrix, and formed a part of the assets in her hands. This view is greatly strengthened from the fact, that the heirs took no step to annul the contract; nor the administratrix, either of whom might have done so; but on the contrary, called the aid of a court of chancery to enforce it.

By the 3rd section of the act of this state, "for the execution of real contracts" it is provided, "that any person who has made a contract for the sale of land, and dies before the completion of it, leaving heirs under the age of twenty-one years, his executors or administrators being desirous of completing such contract, for and on behalf of such minor children and heirs, may apply to the court of common pleas who have power to authorize a conveyance, where the consideration money has been paid or secured to be paid, to be made in pursuance of the contract." This statute would seem to give the representatives of the personal estate a control over contracts for the sale of real property, which authorizes them to enforce such contracts, in all cases, where they may be considered for the advantage of the heirs. No application was made under this statute, by the defendant, it is presumed; because Martin had not paid, and was believed to be unable to pay the consideration money. A final decree was entered against him for the balance of the purchase money and interest, and on his failing to pay it, within a given time, the land was ordered to be sold. A contract thus sanctioned by a court of chancery, by the administratrix of Carrington, and by Carrington in his life time, cannot be considered or treated as a nullity. Chancery has enforced it, and given the heirs the full benefit of its provisions. Under the sale directed by the decree against Martin, the defendant became the purchaser of the land, for the sum of five thousand four hundred and forty dollars and twenty-five cents, as appears from the marshal's deed. What right did the defendant acquire by this purchase? The equitable interest of Martin was all that could be sold, or that the defendant under the sale could purchase. The marshal's deed, therefore, could only invest her with this equity.

The defendant prosecuted the suit against Martin as the administratrix of her husband's estate, but the purchase at the sale seems to have been made on her own account. Being the trustee of her husband's estate, I should entertain doubts whether chancery ought to aid a purchase made under such circumstances. There is no intimation, however, of any unfairness, and the high character of the party forbids any presumption that she did not intend to act in good faith.

It appears that in November, 1823, the defendant filed a bill in the court of common pleas for Clinton county, setting forth the contract with Martin, the proceedings under it, the sale of the land by the marshal, and her purchase of it. She also stated that the purchase money had been paid to the heirs and she prayed that a decree investing her with a title might be made. As the defendants were non-residents, and one of them a minor, notice was given as the statute requires. A decree pro confesso was obtained at a subsequent term.

It is a principle well settled in chancery, that where a person purchases a title, known to be defective by him, at the time, he shall not afterwards object to it, on account of such defect. Where a purchaser under a decree objected to a specific execution of the contract, because a part of the defendants being minors, might open the decree after they became of age, and perhaps set it aside,

it was ruled not to be a valid objection, as the purchaser was bound to know the circumstances under which the decree was rendered. And it is contended that the complainant purchased with a full knowledge of the defendant's title, and that he cannot therefore avail himself of the objections urged against it. He must be presumed to have been acquainted, at least to some extent, with the nature of the title which the defendant acquired by the purchase under the decree against Martin, as in the contract there is an express reference to it. But it would be, perhaps, in the absence of proof, carrying the presumption too far to say, that he was bound to know the full legal import of that title. As a high price was to be paid for the land, it is not to be presumed that the complainant considered himself as purchasing a mere equity. Nor does such a construction seem to have been given to the contract by the defendant. The agent of the defendant who made a verbal arrangement with the complainant respecting the land, states that he did not consider the defendant as having the legal title, though it does not appear that his impressions were communicated to the complainant. From the sum advanced by the complainant to defray expenses of suits, prosecuted by the defendant to perfect the title, it appears that when the defects in the title were known to him, he took no step to disaffirm the contract, but aided the defendant in her efforts to remove the objections to it. It has been decided where a defect in a title becomes known to a vendee during a treaty for the purchase, although he was ignorant of it before, yet, if afterwards he continues the treaty, he shall not, on account of such defect, disaffirm the contract and recover his deposit. The same principle would have a strong application to the complainant if, after he was fully apprised of the objections to the title, he exercised acts of ownership over the land by the receipt of rents, and advanced money to defendant to assist her in procuring a good title. These facts would evince a determination, it would seem, to waive any advantage which a defect in the title might give him, and to abide by the contract. They were certainly calculated to make this impression on the vendor. By the contract there was no time fixed when the conveyance should be executed. The defendant agreed to "sell and convey" the land to complainant, and he agreed to make certain payments. Under this contract the defendant is not bound to make the conveyance until the purchase money be paid.

On the 1st January, 1819, the second instalment of three thousand five hundred and fifty dollars and fifty cents was due, and on the first of the succeeding January, the balance became payable. Neither of these payments has been made.

Although there is a great want of certainty as to time, in the facts proved, yet from their connection it is to be inferred, that no step was taken by complainant evincive of a disposition to rescind the contract, on account of the defects in the title, until a considerable time after the last instalment of the purchase money became due. At what time he abandoned the possession of a part of the land, which he admitted to one of the witnesses he had enjoyed, does not appear. He refused the possession when it was tendered to him, after the suits in ejectment had been decided. From the nature of the contract and the circumstances connected with it, it does not appear, if the vendor now claimed a specific performance of it, that the delay in making the conveyance could be urged as an objection by the complainant. He has neglected to fix the time himself, by paying the purchase money, or offering to pay it. Until this was done the vendor was not bound to convey. But the complainant has not only failed to make payment, but he has done several affirmative acts, which showed an acquiescence in the course taken by the vendor to clear the title.

But there are still two objections to be considered against the right of the vendor, to a specific execution of the contract. First, the great change in the value of the land. Second, the defect which remains in the title. Although modern decisions in England seem to consider a performance as to time, with more strictness than former decisions, still it is admitted that time is of far less importance than a change in the circumstances of the parties, or in the value of the property embraced by the contract. Where the property has not materially changed in value, and the circumstances of the parties in relation to it remain substantially as they were when the contract was made or was to have been performed, time is seldom considered material. But when a specific execution of the contract will give the purchaser the property, greatly deteriorated from the value it bore when he should have received it, it would be unjust to compel him to receive it. Chancery will never interpose its powers under such circumstances, to carry the contract into effect.

But it may be said that in the case under consideration, no time being fixed for the conveyance, the complainant should have fixed the time by the payment or tender of the purchase money, and not having done either, he ought not to be permitted to take advantage of his own negligence. That by failing to place himself in an attitude to demand a title from the vendor, he has acquiesced in the delay and justly incurred the risk of the rise or fall of the land. There is undoubtedly great force in this suggestion, and it is difficult to obviate the objection it presents. McKay. it is alleged, made this purchase for purposes of speculation; at least that he bought under the hope of selling without much delay, at a profit. The purchase and

sale of lands, it is known were made extensively some years ago, by many persons in this state and elsewhere. And I do not know any objection to this business, which does not equally apply to the buying and selling of any other description of property. Land is a fair object of traffic, as well as personal property.

Chancery will not aid what may be called a speculating contract, but a fair purchase of land with a view of again disposing of it, at an advance, does not come within the objection. The object with which any description of property is purchased being lawful, may be considered by a court of chancery. The purchase of a reversionary interest, it has been decided, makes time a material part of the contract. So where an estate is sold to pay off an incumbrance bearing a higher rate of interest than the vendor is entitled to receive. And it may well be said that time is of the essence of the contract, where the vendor has purchased to sell. But to this consideration is opposed the fact that McKay has not entitled himself to the conveyance. It may, however, be fairly presumed, that the embarrassments of the title, and his failure to obtain possession of the land for a number of years essentially injured his interests by preventing a sale of it. Though he had but the equitable title, still if that title had been accompanied by possession, it is probable he might have sold the land, if not at an advance, at least so as to indemnify himself. But the purchasers under Martin retained the possession some seven or eight years after the purchase of McKay, and until they were removed by legal process. Before this was accomplished, and a full possession of the land tendered, it had become less valuable by nearly fifty per cent. than it was when the purchase was made. Although it may be said, therefore, that the vendor was not bound to make the conveyance until the purchase money was paid; yet from the manifest object of McKay in purchasing, the full possession of the land was essential to his interests. This he failed to obtain and the consequences have been extremely injurious to him. This fact, taken in connection with the defect in the title under the decree in Clinton county, is sufficient to refuse a specific performance in behalf of the vendor. There is one infant defendant against whom the decree was entered, who may open it up, and perhaps, as it regards his interests, reverse it when he shall become of age. This, it has often been ruled, constitutes a fatal objection to a title, in a court of chancery, except by purchasers under the decree. But, if a court of chancery would not, under the circumstances of this case, at the instance of the vendor, decree a specific performance of the contract, still it does not necessarily follow that on the application of the vendee the contract will be cancelled. The cases are numerous where both parties having been grossly negligent in the performance of the contract,

have been refused the aid of a court of chancery and left to their legal remedies.

The remaining questions for consideration are, whether under the facts of the case the complainant is entitled to the interposition of a court of chancery, and if so, what relief can be given him. It is a rule in chancery that he who claims its interposition, must not only show himself entitled to it by the fairness of the contract, but also, by having done on his part what in equity he was bound to do. In this case it is contended—that the relief sought is at law and not in chancery; and that if chancery take jurisdiction, the relief to the extent prayed for cannot be given. Where the vendor of land has no title, or a defective title, and there are outstanding notes or bonds given for the purchase money, which may be assigned, chancery will take jurisdiction of the case and order the notes or bonds to be delivered up and cancelled. In such a case the remedy at law is inadequate, because the vendor may delay the commencement of an action for the purchase money at his pleasure, and if the obligations were assigned without notice, they being negotiable, a failure of consideration could not be set up against the assignee. No reference to authority need be made to sustain this position. It involves the exercise of a power which exclusively belongs to a court of chancery, and which has been exercised on numerous occasions.

But the question arises, whether the powers of a court of equity can be extended, beyond that of rescinding the contract. The damages to which the vendor, by his failure, has subjected himself, it is insisted must be ascertained in a court of law. In the case of Denton v. Stewart [1 Cox, Ch. 258]; 1 Fonbl. Eq. 44, note 2, Lord Kenyon, master of the rolls, sitting for the chancellor, directed the master to enquire what damages the plaintiff had sustained by the defendant's not performing his agreement, of which a specific performance was prayed by the bill, but which could not be decreed; the defendant having by sale of the estate put it out of his power to perform his agreement with the plaintiff. On the authority of this decision was the case of Greenaway v. Adams decided, in 12 Ves. 395. In that case the master of the rolls observes: "The party injured by the non-performance of a contract has the choice to revert either to a court of law for damages, or to a court of equity for a specific performance. If the court does not think fit to decree a specific performance, or finds that the contract cannot be specifically performed, either way he should have thought there was equally an end of its jurisdiction; for in the one case the court does not see reason to exercise the jurisdiction; in the other the court finds no cause for the exercise of it. However, the case of Denton v. Stewart is a decision in point against that proposition." In the case of Gwillim v. Stone, 14 Ves. 128, which was a bill to have a contract delivered

up, on the ground of the defective title of the defendant, and for compensation for the injury to the plaintiff by the failure of the contract, the decree was made for delivering up the contract without prejudice to an action, instead of an enquiry before the master. In this case the master of the rolls observes, that in the case of Denton v. Stewart, and Greenaway v. Adams, above cited, the object of the bill was a specific performance; and in the latter he had some doubt upon the principle. This bill, he stated, is of a different nature, asserting from the first that the defendant cannot make a good title. It is more proper for an action. The equitable relief is obtained by a decree for the delivering up the instrument. The bill in the case of Todd v. Gee, 17 Ves. 275, prayed for the specific performance of an agreement for the sale of an estate to the plaintiff by the defendant; or if the defendant cannot perform it, that the plaintiff may receive satisfaction for the damages and injury sustained by the non-performance. And the lord chancellor observes in the case, "that he should be inclined to support the whole course of previous authority against Denton v. Stewart, not being aware that the court would give relief in the shape of damages, which is very different from giving compensation out of the purchase money. That court, he states, except under very particular circumstances, as these may be, upon a bill for the specific performance of a contract to direct an issue or a reference to the master to ascertain the damages. That is purely at law. It has no resemblance to compensation." Upon an adjournment of this case, the lord chancellor again observes, "that his opinion on the three cases cited (Denton v. Stewart, Greenaway v. Adams, and Gwillim v. Stone) was confirmed by reflection; that, excepting any special cases, it is not the course of proceeding in equity, to file a bill for a specific performance of an agreement, praying in the alternative, if it cannot be performed, an issue or an enquiry before the master with a view to damages. The plaintiff must take that remedy, if he choose it, at law generally, though not universally. In Denton v. Stewart, the defendant had it in his power to perform the agreement, and put it out of his power pending the suit. The case, if it is not to be supported on that distinction, is not according to the principles of the court."

From these authorities, it appears that the decision in the case of Denton v. Stewart has been overruled, or at least has been considered as turning on the peculiar circumstances of the case. The circumstance of the vendor having conveyed the title during the pendency of the suit, seems to be considered as the principal ground on which damages were decreed. The decision in that case cannot derive much support from the case of Greenaway v. Adams, for the master of the rolls seems to have yielded to the authority of the former case contrary to his own convictions, without adverting to the circumstances of the case, as stated afterwards in the case of Todd v. Gee. The objection to a decree for damages seems to be considered from the above authorities as stronger where a rescission of the contract is asked, than where a specific execution of it is prayed and damages in the event of the vendor not being able to make a good title. But in either case, by the authorities cited, except under peculiar circumstances, damages will not be decreed. In a bill for a specific performance, if the vendor be not able to make a conveyance for the entire estate sold, the purchaser may insist for the specific thing, so far as the right of the vendor extends, and compensation out of the purchase money for any embarrassment of the title or deficiency in the number of acres sold. If in such a case, however, the whole of the purchase money has been paid, it is difficult to distinguish it in principle from a case where the rescission of the contract is prayed. In the one case one half of the land is deficient, and a decree is entered for the one half, and the return of the purchase money paid with interest for the other half. In the other case the vendor having no title to the land, the whole of the purchase money paid is decreed with interest. If in the one case it may be said that chancery acquires jurisdiction by decreeing a specific execution of the contract in part, and consequently may put an end to the matter in controversy by doing full justice between the parties; may it not be said in the other, that jurisdiction is equally acquired by the court where there are outstanding negotiable notes or bonds given for the purchase money, which if assigned may be enforced against the vendee, and which should therefore be delivered up and cancelled.

In the case of Law v. Pratt, 9 Cranch [13 U. S.] 469, the court observe that "to obtain a specific performance is no object of Law's bill, it is incumbent on the opposite party therefore, to show some ground of right to force such a decree upon him. But considering as we do that Law is not in default, there can be no reason to decree a specific performance, when every thing shows that it would be productive of nothing but loss. Besides, a specific performance, such as would answer the ends of justice between these parties, has now become impossible. An issue quantum damnificatus it is certainly competent for this court to order in this case, but it is not consistent with the equity practice to order it in any case, in which the court can lay hold of a simple equitable and precise rule to ascertain the amount which it ought to decree." The court in that case decreed that the defendant should refund, for the deficient lots at the rate of the purchase. In a subsequent case between Dunlap v. Hepburn, 1 Wheat. [14 U. S.] 197, the court say: "There are many cases in which a court of equity, although it would not decree a specific performance, will yet refuse to order a contract to be cancelled. The inability of the vendor to

make a good title at the time the decree is to be pronounced, furnishes a very good reason for excluding him from relief in a court of equity; and yet it does not follow that the court will for this reason merely, set aside the contract. Generally speaking a court of law is competent to afford an adequate remedy to either party, for a breach of the contract by the other, from whatever cause it may have proceeded; and whenever this is the case a resort to a court of equity is improper. But if the contract ought not in conscience to bind one of the parties, as if he had acted under a mistake, or was imposed upon by the other party, or the like, a court of equity will interpose and afford a relief which a court of law cannot, by setting aside the contract; and having thus obtained jurisdiction of the principal question, that court will proceed to make such other decree as the justice and equity of the case may require."

In the case under consideration, the second instalment became due the 1st January, 1819, and the third the 1st January, 1820. Neither of these instalments were paid by the complainant, but he filed his bill the 13th April, 1821, for a rescission of the contract. Has he by a failure to pay these instalments been guilty of such negligence as to prevent the interposition of a court of chancery in his behalf. Did equity require that he should part with his money before he obtained possession of the land agreeably to contract, when it was apparent the vendor could not make him a title. The first default seems to have been with the vendor, in not putting the complainant into possession of the land. Had the complainant called upon the vendor for a specific execution of the contract, it would have been essential for him to have paid, or offered to pay the whole of the purchase money; but as he goes for a rescission of the contract, on account of a defect of title in the vendor, connected with other circumstances, a payment of the purchase money was unnecessary. To have paid the balance of the purchase money could not have strengthened the equity of the complainant. Chancery requires no act to be done in vain: it therefore could not require the payment of the purchase money in this case, after the defects in the title had become fully known to the complainant. More than two years were suffered to elapse from the time the second instalment became due to the filing of this bill. Was it incumbent on the complainant to give notice to the vendor, of his determination to rescind the contract so soon as he discovered the defect in the title. In ordinary cases this might be necessary, but in this case the possession in part of the land was given to the complainant and he, no doubt, entertained the hope that the entire possession would soon be relinquished to him. And under this expectation he seems to have given time to the vendor to clear the title. This bill was filed in April, 1821, and it was not until November that the vendor took the first step to perfect her title by filing a bill against the heirs of her deceased husband. In August, 1824, a decree was obtained in her behalf. Whether this bill embraced the whole of the heirs or not is left to conjecture; the only evidence of the fact seems to be that they were called the heirs of Edward Carrington, deceased, in the bill. A decree pro confesso was entered against them, one of them being a minor, for whom a guardian ad litem was appointed.

As before remarked, the court do not consider the vendor in an attitude to demand a specific performance of the agreement. The delay, the failure to give possession, the change in the value of the property, and the intrinsic defect in the title, are insuperable objections to such a demand. And these considerations, together with the fact that the notes for the balance of the consideration, are outstanding, and being negotiable may be assigned, constitute a ground, as we think, for the equitable interposition of this court. And taking jurisdiction of the case on these grounds, the court will not stop short of settling the matter in controversy. They will decree a rescission of the contract, that the outstanding notes be delivered up and cancelled, and that the money paid on the purchase be repaid with interest. This appears to be within the spirit of the decisions cited from Cranch and Wheaton, and it cannot be considered in opposition to the English adjudications referred to, unless it be supposed that there are no particular circumstances to vary this case from that of Todd v. Gee, in 17 Ves. 275. The outstanding negotiable notes, and the great change in the value of the land, are believed to bring this case within the English decisions. To rescind the contract and send the complainant to a court of law to recover back the money paid, would seem to be unnecessary, as the rule of damages, the money paid with interest, is the same at law as in equity. There is here then a certain and unvarying rule for the ascertainment of damages, and they can as well be ascertained by the court as by a jury. But the court will go no further in this case. They will not decree a payment of the money alleged by the complainant to have been expended by him, at the instance of the vendor, in the prosecution of certain suits to perfect the title. There is no evidence of the amount of money thus expended, and if there were, the complainant could resort to his legal remedy. This money is not alleged to have been advanced as a part of the purchase money. It may have been advanced under an agreement which is only properly examinable at law. At all events there are no special circumstances made known which connect this expenditure with the original contract, so as to bring it within the jurisdiction of the court. Nor will the court order the land to be sold to satisfy the amount decreed to be repaid. There is no allegation that the vendor is in doubtful circumstances,

or that the decree will not be complied with, or may not be satisfied in the ordinary mode. The costs of the suit to be paid by the defendant.