DE GRASSE B. FOWLER, Respondent, *v.* PETER SMITH and MARY A. SMITH his wife, Appellants.

In an action for the purchase-money of land conveyed by deed without covenants, want of title in the vendor, is no defence, unless the vendee has been evicted.

The law will not imply covenants of seisin in a conveyance of land by deed.

The Court should refuse to instruct the jury on abstract questions of law not applicable to the evidence.

As a general rule, the laws of a conquered or ceded territory remain in force until changed by the new sovereign. But a strict application of this rule would, in many cases be unjust; and the Mexican laws on the subjects of usury and implied warranty, in the sale of land, may be deemed to have been abrogated by the customs and usage of American emigrants, before any formal act of legislation abolishing those laws.

No usury law was in force in California in January, 1850, though the Mexican laws had not then been abolished by legislation.

APPEAL from the Superior Court of the City of San Francisco.

Fowler filed his complaint on the 13th of February, 1851, stating, that on the 23d of January, 1850, at San Francisco, Smith executed seventeen promissory notes, each for $1000, payable to the plaintiff, one every month, with interest at two per cent. per month; and that on the same day, Smith and wife executed to the plaintiff a mortgage upon a lot in San Francisco, to secure the payment of said notes. The complaint alleged that five of the notes, (the 8th, 9th, 10th, 11th and 12th,) were due and unpaid, and prayed judgment against Smith therefor, and for a foreclosure and sale. A copy of the mortgage was

annexed to the complaint, in which it was recited that the notes were given for the purchase-money of the premises, conveyed by the plaintiff to Smith on the same day.

The defendants answered, 1st, denying the allegations of the complaint. 2nd. That the plaintiff, at the time of selling and conveying the lot to Smith, fraudulently represented himself as the true owner of it: but that the plaintiff had no title, his only pretence of right being founded on a grant made by George Hyde, as Alcalde of San Francisco, in 1847, who had no authority to make the grant: wherefore the notes and mortgage were obtained by fraud, and without consideration. 3d. That the contract for interest, was usurious. 4th. That since the sale, one Gillis had taken possession of the lot, and still held it, in his own right; and that Smith, having derived no title from the conveyance by the plaintiff, could not evict him. 5th. That the mortgage was not registered in the proper office, as required by the Mexican law, in force at its date; and was therefore void. 6th. That there was lesion beyond a moiety, in the sale; the price being $18000, and the value less than $9000. 7th. That Smith, at the time of the sale, paid $1000; and had since paid the first seven notes, with interest; and praying that the plaintiff be compelled to refund the same, and deliver up the remaining notes and mortgage, to be cancelled; and that the sale be rescinded, &c.; and tendering a reconveyance. A copy of the conveyance from the plaintiff to Smith, was annexed to the answer. It was a deed of bargain and sale, ("doth grant, bargain, sell, and convey unto the said party of the second part, all that certain lot," &c.) in fee simple, without any express covenant. Gillis intervened, stating his possession, &c., and praying to be maintained therein; but subsequently withdrew his petition.

When the jurors were called, one of them, in answer to a question as to his being indifferent, stated that he held a lot in San Francisco, under an Alcalde grant, made since the conquest: whereupon the defendants challenged him for cause; but the Court overruled the challenge, and the defendants excepted.

The plaintiff gave in evidence the mortgage and notes. The defendants objected that the mortgage was void, because not recorded according to the Mexican law in force at its date, and

that the notes were void for usury; but the Court overruled the objections.   The defendants offered to prove that at the time of the sale, the plaintiff had no title to the lot; and that no title passed to Smith by the conveyance: but the Court refused to admit the evidence.   Instructions were asked by the defendants, and refused by the Court, to the effect that the conveyance implied covenants of seisin and warranty; that if the plaintiff had no title to the lot, the notes and mortgage were without consideration; that the contract for interest was usurious; that lesion beyond a moiety, would avoid the sale; that if the mortgage was not recorded pursuant to the Mexican law on that subject, it was void, &c.; and the defendants excepted.   The jury found for the plaintiffs, for the amount of the five notes and interest. A motion for a new trial was made and overruled; and judgment rendered on the verdict, and for a foreclosure and sale.

*E. W. F. Sloan*, and *Shattuck* and *Baine*, for the appellants. 1st. The transaction must be governed by the Mexican law. American Ins. Co. *v.* Cauter, 1 Pet. 542; Cox *v.* Dick, 6 Ib. 203; Desebats *v.* Berguier, 1 Binn. 336; Houghton *v.* Paige, 2 N. Hamp. 42; 11 Pick. 36–8; Strother *v.* Lucas, 12 Pet. 410; Percheman's case, 7 Ib. 51.   2nd. By that law, covenants of seisin and quiet enjoyment are implied, unless the contrary is expressed. The deed purported to convey the *property*.   The vendor of a thing belonging to another, must restore the price. Laws of Spain and Mexico, p. 130, 133.   3d. No eviction is necessary to avoid payment of the purchase-money, where the vendor had no title; though it is otherwise, where the vendee sues for damages, &c.   Hall *v.* Nevill, 3 La. Rep. 326; Pepper *v.* Dunlap, 9 Robins. 289; Ponchartrain R. R. *v.* Durell, 6 La. Rep. 484; Bemis *v.* Dwight, 3 Ib. 337; Duplantier *v.* Pigneu, 3 Martin, 244; Abat *v.* Casteres, 3 N. S. 221; Foster *v.* Murphy, 5 Ib. 80.   4th. The defendants were entitled to all the relief a court of equity could give.   A sale may be rescinded for fraud, misrepresentation, or mistake.   The conveyance amounted to an assertion of title; and a full price was paid. The want of title at least *tended* to prove either fraud or mistake; and should have been submitted to the jury.   1 Story's Eq. sec. 192–3. 208; Bowline *v.* Pollock, 7 Monroe, 26; Hyne

*v.* Campbell, 6 Ib. 286; Parham *v.* Randolph, 4 How. Miss. 450; Smith *v.* Richards, 13 Pet. 26; 1 White's Recop. 196–7; 1 Ves. 95–6; 12 Ib. 78; 1 Domat, sec. 375; 2 Brock. 294. 5th. The contract was usurious. By the Mexican law, interest cannot exceed six per cent. Laws of Spain and Mexico, p. 112. See 1 White's Recop. 151, 225; Story's Eq. sec. 301–2. 6th. The Court should have charged that lesion would avoid the sale. 1 White's Recop. 197; Domat, t. 2, s. 3, 9, a. 1; Poth. Obl., n. 33–4, by Evans; 1 Story's Eq. 269–71.

*Botts* and *Emmett,* contrà. 1st. Where the conveyance contains no covenant, a defect of title in the grantor is no defence to an action for the purchase-money: and an actual eviction under a judgment, is necessary to constitute a breach of the covenant of warranty, or for quiet enjoyment, as well by the civil, as by the common law. Frisbie *v.* Hoffnagle, 11 Johns. 50; Frost *v.* Raymond, 2 Caines, 188; Waldron *v.* McCarty, 3 Johns. 471; Owens *v.* Thompson, 3 Scam. 502; Korts *v.* Carpenter, 5 Johns. 120; Many *v.* Porter, 3 Tenn. 347; Kerr *v.* Shaw, 13 Johns. 236; Guidry *v.* Green, 2 Cond. La. Rep. 525; Fulton's heirs *v.* Griswold, 1 Ib. 548; Winkle *v.* Tyler, 3 Ib. 36; Bessy *v.* Pintado, 3 La. Rep. 488; Poth. on Sales, p. 2, ch. 1, s. 1, 2. 2nd. The interest was not usury, but a part of the price. There was no loan of money. Blyden's Usury, 71– 4; Van Schaick *v.* Edwards, 2 Johns. Cas. 355; Beete *v.* Bidgood, 7 Barn. & Cress. 453.

3d. There was no law in force in California, at the date of this transaction, rendering it usurious. 4th. The maxim, "communis error facit jus," applies to this case.

Justice MURRAY delivered the opinion of the Court. The plaintiff filed his petition in the Court below to recover upon five promissory notes, of $1000 each, bearing interest at the rate of two per cent. per month, and for foreclosure of a mortgage upon lot 121, in San Francisco, to secure the payment of these and other notes, given for its purchase. The defendants pleaded in denial; and by way of special defence, alleged that Smith purchased lot 121 from the plaintiff, for the sum of $18000; and executed eighteen promissory notes of $1000 each, bearing two per cent. interest per month, together with a mortgage upon said

lot, in favour of the plaintiff, to secure the payment of the pur-
chase-money; and that seven of said notes had been paid; that
the plaintiff had fraudulently represented himself to be the
owner of said lot; and that he had no title to it; that the grant
of said lot was made by George Hyde, as Alcalde, in 1847; that
said Hyde had no power to make such grant; that the same was
not in accordance with law; that the plaintiff derived his title
from the grantees of Hyde; that Smith was induced to purchase
by the fraudulent and erroneous representations of the plaintiff;
that the conveyance from the plaintiff contained implied cove-
nants of seisin and warranty; and that the whole contract was
void for usury and lesion, by the civil law, or laws of Mexico,
which were in force at the time of making said contract, and
which must govern its provisions; and that one Gillis was in
possession of the lot, and continued to hold it in his own right.
The defendants also brought into court a quit-claim deed of said
lot, executed by them to the plaintiff; and prayed that their
answer might be taken as a cross-bill; that the money paid be
returned; the out-standing notes cancelled, and the whole con-
tract annulled.   Gillis was also made a party defendant, and
filed his answer; which was afterwards withdrawn by consent of
parties, and his name stricken from the cause.   Upon the trial
of the case, the jury rendered a verdict for the plaintiff for
$6,533 33, upon which the Court entered a decree of foreclosure.
From this judgment the defendants appealed.

Upon the trial in the Court below, the plaintiff read in evi-
dence the notes and mortgage, and rested his case.   The defend-
ants then offered to show that at the time of said sale, the plain-
tiff had no title to lot 121, and that Smith had never derived any
valid title to said lot by said purchase; which testimony was re-
jected by the Court.   The defendants then introduced a witness
to prove fraudulent representations by the plaintiff, but the tes-
timony does not show any fraud whatever.   The defendants
asked the Court to give the jury fifteen instructions, covering
all the points raised in the answer; which were refused by the
Court.   The applicability of most of these instructions must de-
pend upon the refusal of the Court to allow testimony that
the plaintiff had no title at the time of the sale to the defend-
ants.

It is contended by the appellants, that inasmuch as the sale in question was made before the adoption of the common law as the rule of decision, and the repeal of all previously existing laws by the Legislature of 1849 and 1850, the civil or Mexican law must govern the contract; that the deed from Fowler to Smith, though a quit claim, (or conveyance without covenants,) by the common law, by the civil law contains implied covenants of seisin, warranty, &c.; and that the want of title in the vendor at the time of sale is a sufficient defence in an action for the purchase money. The exact meaning of the civil law, as contradistinguished from the Mexican law, does not appear to be well understood; and the many changes it has undergone in Spain and America, and the engraftments upon, and modifications of it by enactments of the Mexican Congress, do not warrant the indiscriminate reference to civil law writers for controlling precedents in cases arising in our Courts. The deed from Fowler to Smith contains no covenants whatever, unless this Court should hold that there are covenants arising by implication of law. And granting for the present that this deed must be governed by the civil law, I have been unable to find any authority which would raise other covenants than those for quiet possession. It has long been the settled rule at common law, that where there are no covenants of seisin, &c., in the deed, the defendant cannot avoid the payment of the purchase money on the ground that the title existed elsewhere than in the grantor. In order to constitute a breach of the covenant of warranty or quiet enjoyment, there must be an eviction under the judgment of a competent court founded on a paramount title. In Waldron v. McCarty, 3 Johnson, M. gave a deed to W., and covenanted to keep him in quiet possession. At the time of the sale there was a previous mortgage on the premises; a foreclosure and sale were decreed under which W. purchased, and brought an action on his covenant. The court held that the action could not be maintained until ouster or eviction by a paramount lawful title. This is also the doctrine of the civil law. The defendants have neither pleaded nor proved an eviction; and the Court below was correct in refusing to inquire into the title until Smith was disturbed by authority of law. The mere apprehension that a party may be

disturbed is not sufficient to authorize a court of law to inter-
fere.

The defence of lesion was abandoned on the argument of the
case.   There was no proof whatever of fraudulent misrepresen-
tations.   The instructions asked for on this point were wholly
irrelevant.   If there had been any proof, however slight, it would
have been the duty of the Court to give to the jury the law ap-
plicable to such testimony; but it is not incumbent upon the
Court to instruct the jury upon mere abstract questions of law,
irrelevant to the case, and serving only to bewilder and mislead
them from the true issue to be determined.

But it is contended by the appellants that the Court erred in
not charging the jury that the contract was usurious and void.
It was stated on the authority of counsel, upon the argument of
this case, that all contracts to pay a higher rate of interest than
six per cent. per annum, either upon money loaned, or otherwise,
were made void by the law of Mexico, and that said law was in
force at the date of the sale in question.   I cannot approach this
point without great hesitation, well knowing that I shall have to
contend with what, by many, is considered the settled rule upon
this subject.   But the frequency of these pleas, and the growing
disposition of counsel to apply the principles of the civil or Mexi-
can law to every contract entered into before the passage of the
act abolishing all laws previously existing in California, require
that some adjudication should be had which may govern these
cases for the future.   The argument of the appellants is based
upon the well recognized principle of international law, that the
laws of a ceded country remain in force until changed by the
conquering or acquiring power.   This principle is to be found in
almost every work upon the subject of national law, and is reite-
rated and affirmed by the Courts of England and the United
States.   Its application to this case can, however, only be de-
termined by an examination of the rule, and the particular cir-
cumstances under which it is sought to be applied.

The law of nations is said to be founded on right reason, sound
morality, and justice: but although it is said to be binding upon
nations in their intercourse and transactions, still we find the
Courts of the United States and Europe, in many instances, dif-
fering in the application of its rules, and even disregarding

them.   As the world has advanced in civilization and learning, the influence of religion has been felt and recognized by the Christian countries of Europe, in their intercourse with each other.   War has been stripped of many of its most disgusting features.   It is no longer considered as the moral condition of man and nations; but only justifiable when resorted to to preserve national honour, prosperity, and happiness.   Under this enlightened policy, more sympathy has been shown to the unhappy sufferers by these great public calamities.   Instead of the confiscation of property, the loss of liberty, and all the horrors of barbarous warefare, their rights are respected, and their municipal regulations remain in force until changed by the conqueror: and it needs no argument or illustration to show the justice of the rule.   This is also the rule in countries acquired by purchase.   The transfer of sovereignty should not, and does not, affect vested rights: and this was precisely the meaning of Chief Justice Marshall, in Percheman's case, 7 Peters, where he lays down the doctrine that the relations and rights of property of the inhabitants remained unchanged; that the land in question did not pass to the United States by the treaty of cession; and that the government of Spain, having parted with it to one of its citizens, had no power to dispose of it to another.   This is founded on absolute principles of right, and will admit of no departure; while the justice of the rule, that the laws of the ceded country remain in force until changed by the new sovereign, may, in many instances, depend on the peculiar circumstances of the case.   In an acquired territory, containing a population governed, in their business and social relations, by a system of laws of their own, well understood and generally accepted, it is but reasonable that the inhabitants should continue to regulate their conduct and commercial transactions by their own laws, until the same are changed.   The reason is obvious, and founded, in many instances, on the difference of language and systems of jurisprudence, the peculiar circumstances of the country, the confusion consequent on such change, and the time necessary to ascertain the applicability of the new laws.   It will be observed, that the rule pre-supposes that the acquired country contains a population governed by well settled laws of their own.   Let us

inquire whether these reasons · apply with equal force to this case.

California, at the time of its acquisition by the United States, contained but a sparse population. It had long been looked upon as one of the out-posts of civilization. Its commercial, agricultural, and · mineral resources undeveloped, it was considered of little importance by the Mexican Government. The body of Mexican laws had been extended over it; but there was nothing upon which they could act; and they soon fell into disuse. The system of government was a patriarchal one, and administered without much regard to the forms of law, which were scarcely alike in any two districts. Such was the state of the country, when the discovery of our mineral wealth roused the whole civilized world to its importance. In a few months, the emigration from older States exceeded five times the original population of the country. A State government was immediately formed, to meet the wants of this unexpected population. The whole world was amazed by our sudden progress; and even the Federal Government, startled from her usual caution by so novel a spectacle, beheld us take our place as a sovereign State, before her astonishment had subsided. Emigration brought with it business, litigation, and the thousand attendants that follow in the train of enterprise and civilization. The laws of Mexico, written in a different language, and founded on a different system of jurisprudence, were to them a sealed book. The necessities of trade and commerce required prompt action. This flood of population had destroyed every ancient land mark; and finding no established laws or institutions, they were compelled to adopt customs for their own government. The proceedings in courts were conducted in the English language; and justice was administered by American judges, without regard to Mexican law. Custom was for all purposes law. No law concerning usury was recognized, or supposed to exist.—Under this peculiar system, this country acquired its present wealth and prosperity. But it would have been much better for the permanent interests of this country, that its progress had been less rapid, if, after escaping from the tutelage of a territorial government, we are to be fettered by the dead carcass of a law which expired at its birth, for want of human transactions on which to subsist; the

application of which would overturn almost every contract entered into before the act abolishing all laws, &c.—would unhinge business, and entirely destroy confidence in the country.

There is no case like the present to be found in the history of the world. In every instance cited in the books, the acquired country had a population of its own, governed by known laws; and the rate of emigration had been small, compared to the number of original inhabitants. History may be searched in vain for an instance parallel with the emigration to this country. If it would be unjust to compel a densely populated State to take notice of the laws of the conqueror or acquiring power, without any other act than that of submission or cession, it would be still more unjust in this country, where the American population so greatly outnumbered the natives, to compel us to apply their law, instead of our own, to contracts. In this case, the rule consequent upon the discovery or acquisition of an uninhabited territory, might almost apply; and to construe these contracts by a system of laws not adapted to the age, nor to the spirit of our institutions, altering the plain meaning of parties, and giving to them conditions which were never intended, would work the grossest injustice.

In the case of Center *v.* The American Ins. Co., 1 Peters, relied on by the appellants, C. J. Marshall lays down the general doctrine, that all laws of a ceded country, except those of a political nature, remain in force until changed by the new sovereign. That case bears no analogy to the present one; and I do not understand that the decision rested on this principle. The same principle is referred to by Mr. Justice Baldwin in Mitchell *v.* The United States, 9 Peters; but the rights of the parties in that, as well as in Percheman's case, were settled by treaty stipulations. The application of the rule in every one of the numerous authorities cited by the appellants, was calculated to sustain legal and equitable rights. Here, a strict adherence to it would work manifest injustice, and open the door to the grossest frauds.— In the case of the Canal Appraisers *v.* The People, 17 Wendell, Chancellor Walworth lays down the rule, that in the case of a country acquired by conquest, or even by cession, no act of legislation is necessary to change the laws; the mere act of the conqueror is sufficient. In support of this proposition, the learned

Chancellor cites many cases in which the rule has been asserted and maintained. "When the northern barbarians overrun Gaul, Italy, and the Rhenish Provinces, all of which previously had, to a certain extent, been subject to the Roman laws, their leaders neither adopted their own laws nor retained those of the conquered country; but a system of personal laws was allowed to prevail as contra-distinguished from territorial laws. The Romans and their descendants were governed, between themselves, as to their personal rights and their possessions, by the Roman law; the Salian Franks by the Salic law; the Lombards by the Lombardic; the Alemans, Swabians, or Germans, by the Alemonic law; and the Franks upon the borders of the Rhine by the Riparian law. Thus it was said, that five men might often be seen in company, or travelling together, each governed by a different law." In India, the law is different as applied to the rights of English, Hindoos, and Musselmen; and these laws appear to have been adopted without any legislative act of the British parliament, by the mere expression of the will of the crown through charters establishing Courts of judicature. The learned Chancellor also cites a case decided in England, by the Court of Appeals from the Colonies, called the Judicial Committee of the Privy Council, where it was held that the laws of England were adopted and were in force at Gibraltar, which was conquered from Spain in 1784, although there was no other act abolishing the Spanish law than the king's charter of justice, which declared it to be his will that the laws of England should be the measure of justice to be administered between the parties, as near as might be.—I shall not endeavour to institute a comparison between acts of sovereignty expressed through orders and patents of the crown, and the acts of the citizens of California; although there might be some plausibility in the argument that in a republican government like our own, where all power belongs to and emanates from the people, the strongest evidence of sovereign will is the acquiescence and concurrence of the people in a custom. If there is any case in which custom should be regarded as law, or where the principle "*communis error facit jus*" applies, it seems that this should be the case. Perhaps no stronger example of the injustice of the rule contended for could be instanced, than that

this Court has been unable to procure a copy of the law on which this contract is sought to be avoided.

From these considerations, I am of opinion, that from the adoption of our State constitution,—a period antecedent to the execution of the present contract, (or even a still more remote period,) Courts ought not, on grounds of public policy, to disturb these contracts, whenever they have been entered into under the sanction of well known and recognized custom.

The same reasoning will apply to the first point noticed by the Court. The deed from the plaintiff to Smith is in language the acceptation of which has been well understood for centuries; and no one can doubt the meaning the parties intended to convey by this instrument. Yet this Court is asked to give it such a construction as will defeat the intention and raise new obligations between the parties.

From what has been already said, it follows that the Court below properly refused the defendant's instructions.

There are doubtless many cases arising, to which it will be the duty of the Courts of this State to apply the rules of the Mexican law; but this is not one of them.

Judgment affirmed.

*Sloan* for the appellants, petitioned for a rehearing; in support of which he urged, in substance, the following reasons.

It was determined, on appeal to the king in council from the foreign plantations, 1st. That if there be a new and uninhabited country found out by English subjects, as the law is the birthright of every subject, so, wherever they go they carry their laws with them; and therefore such new found country is to be governed by the laws of England, though after such country is inhabited by the English, acts of parliament made in England, without naming the foreign plantations, will not bind them. 2d. When the king of England conquers a country it is a different consideration: for there the conqueror, by saving the lives of the people conquered, gains a right and property in such people; in consequence of which he may impose upon them such laws as he pleases. But, 3d. Until such laws be given by the conquering prince, the laws and customs of the conquered country shall hold place: unless where they are contrary to religion, or enact anything that is

*malum in se,* or are silent; for in all such cases the laws of the conquering country shall prevail.  2 P. Wms. 75; Blankard *v.* Galdy, Salk. 411.  That such is the law, it is believed, has never been heretofore called in question by any enlightened tribunal.

There can be no pretence for saying that California became part of the territory of the United States by discovery.  Nor will it be questioned, that long before California was seized by the American forces, it was a regularly organized territory of Mexico, furnished with laws, and with officers to administer them. These are historical facts, recognized by the treaty of Guadalupe Hidalgo; by acts of Congress, by acts of the Legislature of this State, and by repeated decisions of this Court.  Commissioners are now in session in this city, pursuant to an act of Congress, to ascertain and settle titles to lands in California derived from the Spanish or Mexican government: and these commissions, as well as the Courts of the United States, in deciding on these titles, are required to regard the laws, customs, and usages of the government from which they are derived.  Therefore, as the civil law of Mexico was the law of this territory at the time of its acquisition by the United States, it must have continued to be the law of the land until changed by legislation.  The contrary doctrine would seem a decided innovation upon well established principles, and could hardly fail to produce fearful results; and ought not to be allowed unless dictated by imperative necessity.

It would be unsafe, and contrary to all principle, to allow a real or supposed custom, unsanctioned either by lapse of time, or uniformity, to annul an acknowledged rule of law.  By the first section of the schedule to the constitution, "all rights, &c., and all laws in force at the time of the adoption of this constitution, and not inconsistent therewith, until altered or repealed by the Legislature, shall continue as if the same had not been adopted." The convention, in using the term "laws," cannot have referred to any partial, uncertain, and recent *custom,* in opposition to the Mexican laws.

The Spanish population in the Floridas at the time of their purchase, was smaller than that of California when ceded by Mexico; and yet in Mitchell *v.* The United States, 9 Pet. 732, the principle contended for by the appellants is recognized: and in Mitchell *v.* Tucker, 10 Mo. 260, a parol conveyance of lands

made in Louisiana after its purchase by the United States, but before a change of laws by legislation, was valid by virtue of the Spanish law.

In the case cited by the Court from 17 Wend., Chancellor Walworth says, (p. 584,) "I also supposed it was generally conceded, that the province of New York was claimed by the English by right of discovery, and not by right of conquest." Again he says: "I might also add the well known fact, that upon taking possession of Louisiana by the Spaniards, in 1769, under the treaty of cession of that territory made by France a few years previous, Count O'Reiley, the new governor, acting in the name of the Spanish king, did, by a simple proclamation, abolish not only the form of the government of the colony, but the whole code of the French law, the customs of Paris, and the ordinances of that kingdom, which had theretofore existed, and substituted the Spanish law in their stead: immediately after which time the ancient French laws ceased to exist in the ceded province, and the laws of Spain became the legal rules both as to persons and property: and they so continued until after the cession of Louisiana to the United States in 1803, and are still the laws of the States originally embraced within that colony, except so far as they have been changed by subsequent legislation.

No case is cited warranting the assumption, that the common law was in force here, until introduced by legislation. It could not have been brought here by citizens of the United States, as their birth right. There is no common law of the United States. 8 Pet. 658. In the several States, the common law has been modified by statute ; and in Louisiana, the civil law,—borrowed from Spain and France,—has also been changed by statute. Each State, therefore, had its own peculiar laws. If the emigrants brought with them the laws of their respective States, by what rule are those laws to be applied? But in this case, there was no proof from what States the parties emigrated, nor of the law of those States. The system of personal laws, referred to by Chancellor Walworth, was better adapted to the barbarians who overrun Gaul and Italy, than to emigrants to California from the United States.

Admitting this transaction to be governed by the common law, the deed from Fowler to Smith, was not a quit-claim, but an ori-

ginal deed.   A quit-claim is derivative, to which the word release is the only operative word necessary.   Litt. sec. 444.   A quit-claim is a release by one having the right, to one in possession; and there must be privity, &c.   Com. Dig. Release, B. 3; Bennett *v.* Irvine, 3 T. R. 365; Pillebrain *v.* Jackson, 11 Wend. 110.   As a quit-claim, the deed was void, because there was no privity between Smith and Fowler; because Smith was not in .possession; and because Fowler had no right: and the notes were therefore without consideration.

But the deed was not a quit-claim.   It imported a conveyance of title, and raised an implied warranty.   Christine *v.* Whitehall, 16 S. & R. 98; Maie *v.* Ward, 2 Atk. 228.

Eviction is not necessary to defeat an action for the purchase-money, where there is an outstanding title, &c.   Steenhouse *v.* Witman, 1 S. & R. 438; Hart *v.* Porter's Ex'rs, 5 Ib. 201; Miles *v.* Stevens, 3 Penn. 22; Browning *v.* Wright, 2 Bos. & P.; and see Noake's Case, Coke's Rep.; Crasse *v.* Young, 2 Show. 426.

By the Mexican law, a sale is analogous to a lease at common law, in which there is an implied warranty that the lessor has power to lease; and no eviction is necessary to constitute a breach.   Holden *v.* Taylor, Hob. 12, a; Grannis *v.* Clark, 8 Cow. 39.   See also Shep. Touch. 170.

Where the vendor had no title, equity will relieve by rescinding the contract, and ordering the money paid to be refunded. Wilson *v.* Jeffries, 4 J. J. Marsh. 494; McKay *v.* Carrington, 1 McLean, 50.

The deed amounted to an assertion of title, and was a *suggestio falsi;* for which equity will relieve.   Broderick *v.* Broderick, 1 P. Wms. 239; Lockridge *v.* Foster, 4 Scam. 569.

It is believed that a case in which the former adjudications of this Court are called in question, new rules of law sought to be established, and so many questions of vital interest arise, is worthy of fuller discussion by counsel, and further examination by this Court.

Re-hearing granted.