KING vs. RUCKMAN.

RUCKMAN vs. KING.

1. The established doctrine of equity is, that, in general, time is not of the essence of a contract for the sale of lands. But it may become of the essence of the contract, either by being made so by the contract itself, or from the nature and situation of the subject matter of the contract, or by

King *v.* Ruckman.

express notice given, requiring the contract to be closed or rescinded at a stated time, which must be a reasonable time according to the circumstances of the case.

2. If it clearly appear to be the intention of the parties to an agreement, that time shall be deemed of the essence of the contract, it must be so considered in equity. It will be so held when such intention appears from the nature of the subject matter or the object of the parties, or by parol proof that it was so considered at the time of making the contract. A new agreement, extending the time, is evidence that the parties consider the time material.

3. A stipulation in a contract for the sale of lands, that the vendor, "upon receiving such payments and such mortgage, *at the time* and in the manner above mentioned," will convey, is not sufficient of itself to make the time of the essence of the contract. These words, taken in connection with the negotiations and statements at the time the contract was entered into, when the vendor said he wanted the money to fulfill his contracts for the purchase of some of the land, and the time was changed to a later day at the request of the vendee, and the vendor refused to accept a verbal promise by the vendee to pay it at an earlier date than the vendee wished the contract to express, create an express stipulation that time is of the essence of the contract.

4. The effect of a contract to convey lands, which does not name a place of payment, is to require the vendee to pay the money to the vendor, and to find him for the purpose of payment, or use reasonable diligence to find him.

5. Where a contract is silent as to the place of payment, the burthen of proof to show that a place other than the place of business or residence of the party to be paid was agreed on, is upon the party by whom the money is to be paid.

6. The only testimony allowed to impeach the character of a witness is as to his general reputation in his neighborhood for truth and veracity, and that such reputation is generally bad. A statement by the witness that, from what he knows of the reputation of the witness impeached, he would not believe him under oath, is not sufficient.

7. Where a contract is, as to any part of the lands a conveyance whereof is sought to be enforced, uncertain, and incapable of being rendered certain, it will not be enforced. Nor can the contract as to such part be rejected as immaterial, and performance be ordered of the residue, upon compensation, when the residue and the compensation could only be ascertained by parol.

---

The suit of King is for the specific performance of a contract made by Ruckman with him for the conveyance of lands. The bill was filed July 1st, 1868. The suit of Ruck-

2 D *

man is to have that agreement rescinded, canceled, and de-clared void, on the ground of non-performance by King. His bill was filed July 8th, 1868, and is not a cross-bill. Ruckman, at the time of commencing that suit, did not know of the other. By agreement, both causes were heard at the same time, the evidence taken in each being admitted to be evidence in the other.

The facts of the case sufficiently appear in the opinion of the court.

Mr. A. S. Boyd and Messrs. Fowler & Holcomb (of New York) for King.

King appears, by his own testimony, and from all other circumstances, to have earnestly desired and honestly labored to obtain from Ruckman a conveyance of the property sold him, upon the terms of the contract between them. It has been quite as clear that Ruckman has labored to save himself from the performance of that contract. There seems to be hardly a question of law in the case, unless King were to admit that he did nothing towards the performance of the contract until the 1st day of July; and if he did not, and we were to base our claim to a specific performance in his favor on the ground that time was not the essence of his contract, we should prepare the way for so doing by an appeal to the principle that, in equity, the estate bargained for and agreed to be sold passes to the purchaser as soon as the written contract has been signed by the parties. In the ordinary case of the purchase of an estate and affixing a particular day for the completion of the title, a court of chancery considers that a general object being the sale of an estate for a particular sum, the particular day named is merely formal, and the stipulation means, in truth, that the purchase shall be completed in a reasonable time, regard being had to all the circumstances of the case, and the nature of the title to be made. *Addison on Con.*, p. 173; *Hearne* v. *Tenant*, 13 *Ves.* 287.

And a court of equity discriminates between the terms of

a contract which are formal, and a breach of which it would be inequitable in either party to insist on as a bar to the other's rights, and those which are of the essence and substance of the agreement. *Fry on Spec. Perf.,* § 709.

And we would ask an application to such a case, of that broad and flexible proposition, that whenever, in any particular instance, it is just and reasonable, under the circumstances, that performance of a contract should be insisted upon at the stipulated time, and no extension of that time sanctioned by the court, such will be the rule adopted, and under other circumstances the contrary rule. *Hilliard on Ven.* 180, 181–2, notes. For it is the business of this court to relieve against lapse of time in the performance of an agreement, and especially where the non-performance has not arisen by default of the party seeking to have a specific performance. 1 *Ves.* 450, and note.

And that time, mentioned in the contract of sale for the payment of the purchase money, is not generally of the essence of the contract, and the purchaser does not forfeit his purchase; neither should we lose our contract by neglecting to pay at the day. *Fry on Spec. Perf.* 313, § 709, and note; *Wells* v. *Wells, Ired. Ch.* 596; *Runnels* v. *Jackson,* 1 *How. (Miss.)* 358; *Rogers* v. *Saunders,* 16 *Maine* 92–98; *Att'y-Gen'l* v. *Purmort,* 5 *Paige* 620; *Seaton* v. *Slade,* 7 *Ves.* 273; *Brashier* v. *Gratz,* 6 *Wheat.* 528.

Time is not generally deemed, in equity, to be of the essence of the contract, unless the parties have expressly so treated it, or it necessarily follows, from the nature and circumstances of the contract. If the party comes *recenti facto* to ask for a specific performance, the suit is treated with indulgence, and generally with favor, by the court. 1 *Story's Eq. Jur.,* § 776.

King has shown himself ready, desirous, prompt, and eager to perform the contract, and he comes before the court entitled to be treated with favor. *Alley* v. *Deschamps,* 13 *Ves.* 228; *Moore* v. *Blake,* 1 *Ball & B.* 68; *King* v. *Hamilton,* 4 *Peters* 311.

Equity holds time to be *prima facie* unessential, and will enforce the specific performance of agreements after the time for the performance has been suffered to pass. *Huffman* v. *Hummer*, 2 *C. E. Green* 263; *Williston* v. *Williston*, 41 *Barb.* 635; *Young's Adm'r* v. *Rathbone*, 1 *C. E. Green* 225.

Mere lapse of time constitutes, in itself, no bar to a decree for specific performance. A contract for the conveyance of land decreed after the lapse of twenty-three years. *Toll Bridge* v. *Vreeland*, 3 *Green's C. R.* 157.

This reference to the well known principle that time is not, in equity, the essence of the contract, would only be applicable to the case if we were to admit that nothing was done by King before the 1st day of July, or if, to the same effect, the court were to consider as nothing every effort which King made in that month toward the performance of his contract. Even if King's acts did not constitute a good tender, he has not been guilty of any such unnecessary delay or gross laches as will bar him from relief in equity. 1 *Story's Eq. Jur.*, § 776, and cases cited.

Ruckman cannot avoid specific performance by showing that some portions of the lands mentioned in the contract are not owned, or cannot be procured by him, and that other portions lie in another state.

The main body of the lands are within the state of New Jersey.

If Ruckman cannot make a good title to the whole, King may take title to such as Ruckman has, and accept compensation in damages for the residue. *Allerton* v. *Johnson*, 3 *Sandf. C. R.* 72.

A specific performance may be decreed, though the land is without the jurisdiction of the court, if the person of the defendant is within the reach of its process. 1 *Vern.* 77, 135; *Wyth* 13; 6 *Cranch* 148; 1 *Ves.* 144; *Sutphen* v. *Fowler*, 9 *Paige* 280.

A court of equity may enforce specific performance, although the lands are situated in another state, and the contract was made and was to be performed there, and the

vendor is a non-resident, the defendant being duly served with process and subject to the jurisdiction. 3 *Sandf. C. R.* 185; 9 *Paige* 281; 3 *Ves.* 170; 1 *Sim. & Stu.* 15; 6 *Cranch* 148; *Hopk.* 213; *Cleveland* v. *Burrill*, 25 *Barb.* 532; *Newton* v. *Bronson*, 3 *Kernan* 587.

The description in the contract, although not specific, is sufficiently certain. It has been held that an agreement to convey two hundred and forty acres of land owned by the vendor—defendant—in the town of A, naming also the county and state, is sufficiently certain and definite to be specially enforced. *Richards* v. *Edick*, 17 *Barb.* 260. Thus, for instance, the expression, " Mr. Ogilvie's house," was held sufficient. *Ogilvie* v. *Foljambe*, 3 *Mer.* 53. Upon the same principle specific performance of a contract will not be refused because, in the description of the land, it omitted to state the town in which it lies. *Robeson* v. *Hornbaker*, 2 *Green's C. R.* 60.

*Certum est quod certum reddi potest.*

To the proposition that in equity a contract to be specifically performed must be mutual, there is an exception that the purchaser can insist on having all that the vendor can convey, with a compensation for the difference. *Fry on Spec. Perf.*, *p.* 133, § 299. And if the vendee chooses to take as much as he can have, he has a right to that, and to an abatement. *Mortlock* v. *Buller*, 10 *Ves.* 315; *Milligan* v. *Cooke*, 16 *Ves.* 1; *Hill* v. *Buckley*, 17 *Ves.* 394; *Bennett* v. *Fowler*, 2 *Beav.* 302; *Waters* v. *Travis*, 9 *Johns. C. R.* 465.

This principle is offered in answer to the objection which may be made by Ruckman, that he has not the title to the land sold, and therefore cannot perform his contract.

Where the vendor has contracted to convey a tract of land, the title to a part of which fails, the vendee may claim a specific performance of the contract as to the residue of the land, with a compensation in damages, in relation to that to which the vendor is unable to give a good title. *Morss* v. *Elmendorf*, 11 *Paige* 287.

And it must not be understood that the incapacity of the defendant to perform a contract literally and exactly in all its parts, will be a· bar to its performance. *Fry on Spec. Perf.*, § 667.

Compensation for deficiency in the purchase of land is essentially a matter of equity jurisdiction. *Castleman* v. *Veitch,* 3 *Rand.* 598; *Graham* v. *Oliver,* 3 *Beav.* 124; *Hepburn* v. *Auld,* 5 *Cranch* 262; *Couse* v. *Boyles,* 3 *Green's C. R.* 212; *Morss* v. *Elmendorf,* 11 *Paige* 287.

The general rule (for it is not universal) in all such cases is, that the purchaser, if he chooses, is entitled to have the contract specifically performed, as far as the vendor can perform it, and to have an abatement out of the purchase money, or compensation for any deficiency of title, quantity, quality, description, or other matters touching the estate. 1 *Story's Eq. Jur.*, § 779, and cases cited.

Nor will the fact that there is in the bill no prayer for compensation, deprive King of his rights to it, for even compensation may be granted for a defect appearing on the investigation of the title, though the frame and prayer of the bill and the decree made at the hearing, make no reference to compensation. *Fry on Spec. Perf.*, § 793.

And where the defendant deprives himself of the power to perform his contract specifically during the pendency of a suit to compel such a performance, the court will retain the suit, and will award to the complainant a compensation in damages for the non-performance of the contract by the defendant. *Morss* v. *Elmendorf,* 11 *Paige* 287.

The contract between Ruckman and King concludes with a provision in these words: "If either party fail to comply with this contract, the party so failing shall forfeit and pay to the other the sum of $20,000."

There are of course two possible interpretations which can be put upon these words, and these are determined by this question: What is the agreement? Is it, that this conveyance shall be made with the provision of this $20,000, as a penalty added to secure its performance, or is it, that the

payment of this $20,000 shall be received in place of the conveyance, if either party choose to pay it ?

It is always the duty of this court to inquire into the peculiar facts and the peculiar merits of each case, and to decide as they may direct. 2 *Parsons on Con.* 510, and cases cited.

And so the subject matter of the contract may be inquired into, so far as respects the situation of the parties and the facts controlling the agreement, to ascertain the circumstances out of which the contract originated, and especially in regard to the consideration. *Hilliard on Vendors* 531, and notes; *Hodges* v. *King*, 7 *Metc.* 586.

With respect to the case in question, we first observe that there is no designation of this $20,000 as a penalty, or as liquidated damages, and we must observe that these words were thought by Ruckman to have been inserted as a penalty, for, after a characteristic oath, he says to King: "If you don't pay the $19,900 on the 1st of June, I will make you do it, and pay the $20,000 besides."

That this sum was inserted as a penalty, is thus shown from the opinion of one of the parties, and is made entirely clear by a thought of the stipulated value of the subject matter and all the purposes of the agreement. It cannot be supposed that the sum named would be an equivalent to the advantage of the contract to either party, or in keeping with the price named therein. If it had been intended to insert a sum as liquidated damages, one of a larger amount and more consistent with the magnitude of the transaction would have been named.

A sum specifically named in a written agreement "as liquidated damages," in case either party should fail to perform the contract, must, nevertheless, be construed as a penalty, where, upon the face of the instrument, it appears that such sum will necessarily be an inadequate compensation for the breach of some of the provisions of the contract. *Lampman* v. *Cochran*, 16 *N. Y. R.* 275.

In case of an agreement to do some act, and upon failure to pay a sum of money, the court will look into the intent

of the parties; but, although the term "liquidated damages" will not be conclusive, the phrase "penalty" is generally so, unless controlled by some other very strong considerations. *Sedgwick* 485; 2 *Story's Eq. Jur.*, § 1318.

A purchaser of land who has contracted to pay a specific sum as the price, cannot be relieved from the payment by a tender of a less sum, also agreed upon in the contract as stipulated damages, to be paid in case of non-performance on his part. *Hilliard on Vendors, p.* 22, note; *Ayres* v. *Pease,* 12 *Wend.* 393.

If it be doubtful, from the terms of the contract, whether the parties mean that the sum mentioned in it shall be a penalty or liquidated damages, then I should incline to consider the clause as creating a penalty, and not giving stipulated damages. *Hilliard on Vendors* 531, *et passim,* note; *Ibid.* 539, note; *Crisdee* v. *Bolton,* 3 *Carr. & P.* 240; *Owens* v. *Hodges,* 1 *McMullan* 106 : *Foley* v. *McKeegan,* 4 *Iowa* 1.

King assigned to four other gentlemen, each one fifth interest in this contract. The assignment was made after these suits were commenced.

The rule of a court of equity is simply and generally, that all persons interested in the subject matter of the suit shall be brought before it, that all the rights of all may be protected, and all questions in the matter determined. But the exception is as old as the court itself, that when persons take interests by assignment in a matter already in litigation, they are fully bound by the decree. So when he comes *in pendente,* and while the suit is in full prosecution, and without any color of allowance or privity of the court, then regularly the decree bindeth. LORD BACON, *vol. IV, p.* 511.

Generally speaking, an assignee *pendente lite* need not be made a party to a bill, or be brought before the court, for every person purchasing *pendente lite* is treated as a purchaser with notice, and is subject to all the equities of the persons under whom he claims in privity. And it will make no difference whether the assignee *pendente lite* be the claimant of a legal or equitable interest, or whether he be the

assignee of the plaintiff or defendant. *Story's Eq. Pl.*, § 156; 1 *Story's Eq. Jur.*, § 406; *Cook* v. *Mancius*, 5 *Johns. C. R.* 95; *Bishop of Winchester* v. *Paine*, 11 *Ves.* 194, 197; 2 *Story's Eq. Jur.*, § 908; *Metcalfe* v. *Pulvertoft*, 2 *Ves. & B.* 204; *Hoxie* v. *Carr*, 1 *Sumner* 173.

The maxim, *pendente lite nihil innoveter*, prevents the denial of justice which would be caused if a party to a cause could continually assign his claim, and thus force upon his opponent so frequent an amendment of his pleadings as to create such a result. And he who purchases during the pendency of a suit is held bound by the decree that may be made against the person from whom he derives title. The litigating parties are exempted from taking any notice of the title so acquired, and such purchaser need not be made a party to the suit. 1 *Story's Eq. Jur.*, § 406. Suits would be indeterminable, if one party pending the suit could, by conveyances to others, create a necessity for introducing new parties. 2 *Story's Eq. Jur.*, § 908.

Even-handed justice can only be satisfied by a specific performance of the contract in question.

Ruckman does not come forward with clean hands. He asks for the interposition of equity upon a technicality which would not avail him in a court of law. His bill is based upon an alleged default which never occurred, and into which he vainly endeavored to entrap King. He presents himself before a tribunal to which he has by his own language, manner, actions, intentions, cunning, and evil design, rendered himself a stranger, and with peculiar ill grace demands to be relieved from the obligations of a contract drawn by his own attorney, and in all respects fair and reasonable. His reliance is neither on his own readiness nor on King's refusal to perform, but on the pretended omission of King to make one of the three payments at the place where he, Ruckman, in the face of every probability and much positive testimony, pretends it should have been made.

The advantage sought to be taken by Ruckman is repug-

nant to every principle of equity, for the "equity" demanded by him is to have the whole transaction rescinded. He asks to be relieved from all his obligations and left in the possession of the fruits of his own bad faith.

Equity will not declare as void, contracts which have been fairly entered into; nor will it lend itself to defeat the ends of justice by the application of strict technical rules of law. *Galway* v. *Fullerton*, 2 *C. E. Green* 389.

The contract is certain and fair in all its parts. The consideration is adequate. King has not at any time been in default. He proffered himself ready and willing to perform, and when the bad faith of Ruckman became apparent, he promptly applied for equitable relief, and has fairly placed himself within reach of the rule laid down by this court in a recent case.

"Under such circumstances, it is as much a matter of course for courts of equity to decree a specific performance as it is for a court of law to give damages for breach of it." *Hopper* v. *Hopper*, 1 *C. E. Green* 147; *Hall* v. *Warren*, 9 *Ves.* 608; *Greenaway* v. *Adams*, 12 *Ves.* 395, 400; 1 *Story's Eq. Jur.*, §§ 751, 771.

*Mr. Ransom*, for Ruckman.

I. The contract is so uncertain and undefined in regard to the location, description, quantity, and title to the land, a conveyance of which is sought, that there can be no specific performance decreed.

1. As to location, description, and quantity of the land.

Neither the contract nor King's bills describe any specific land for which a conveyance is sought. The contract describes the lands as follows:

"All the lands and premises which said party of the first part owns or holds contracts for, situate in the township of Harrington, in the county of Bergen, and state of New Jersey, which lie east of the old Closter road, leading from Piermont to Englewood, and between the Alpine road ("the old Closter Dock road,") and the north line

of the state of New Jersey; also, all his land situate in said township, lying between the Huyler's Landing road and the old Closter Dock road; also, all his lands situate in Rockland county, in the state of New York, and lying east of the old Closter road, leading from Piermont to Englewood; and also, two lots of land in Hackensack township, state of New Jersey, county of Bergen; the whole of the above described premises containing about two thousand acres; a portion of the above being bounded by the Hudson river."

This description extends from Piermont, in the state of New York, on the north, to Huyler's Landing road, in the state of New Jersey, on the south, from a road called Old Closter road, on the west, to the Hudson river, on the east, with two lots of land in Hackensack township, Bergen county, a territory some eight or nine miles in length and three or four in width.

The lands for which King asks a conveyance are not in any way described in his bills more definitely than in the contract.

Suppose a specific performance should be decreed, what kind of a decree could be made? A decree directing a conveyance must specify the lands to be conveyed, so as to leave no doubt or uncertainty as to what lands the party is directed to convey. It ought, also, to specify the terms on which the conveyance is to be made and the amount of money to be paid for the conveyance.

In this case, there is no evidence to supply the uncertainty of the bill. If the uncertainty in the description of the land in the contract could be remedied by a survey, and by extrinsic evidence, if the specific land could in that way be determined, this should have been done, and a certain and clear description, with exact quantity, should have been inserted in the bill, so that a definite and certain decree could be made. But in this case, I submit that the location, description, and quantity are so indefinite and uncertain that it cannot be made definite and certain by evidence or inquiry.

How many acres are to be conveyed? How are we to

ascertain how many acres are to be included in the conveyance, and paid for by King at $275 per acre? The contract says: "The whole of the above described premises containing about two thousand acres." How are we to ascertain whether it is eighteen hundred or twenty-two hundred acres, more or less? For, before it can be conveyed, the exact number of acres must be ascertained, as it is to be paid for by the acre.

Before the court can decree a specific performance of this contract, it must be distinctly ascertained what particular land is meant by the contract, where each parcel is located specifically, and the exact number of acres the several parcels contain.

I submit that it is not in the power of this court to ascertain from the contract, the complainant's bill, or any evidence in the cause what particular lands are meant by the contract, or how many acres they contain.

The lands mentioned in the contract lie in two states, two counties, and three townships. A portion of them are described simply as " two lots of land in Hackensack township, state of New Jersey, county of Bergen."

What lots are meant? Where do they lie? How are they bounded? How many acres do they contain? These are questions which at once suggest themselves, and they are questions which cannot be satisfactorily answered. Ruckman may have lots of land lying in different parts of the township of Hackensack, containing different quantities of land. He may have power to sell other people's lands, and have none of his own. He may claim that the lots referred to in the contract lie in one place: King, that they lie in another. Ruckman may contend that they contain half the two thousand acres referred to in the contract; while King may insist that they contain only a quarter of the whole quantity. How can a conveyance of lots so described be decreed to be conveyed? How can a decree directing two lots of land in Hackensack township to be conveyed, be enforced, or to what land, under our statute, would such a

decree give title? This uncertainty is not removed by any allegations in the bill, or any evidence in the case.

2. The contract is so indefinite, undefined, and uncertain as to the title to the land referred to therein, that no conveyance can be decreed.

The contract is for lands which Elisha Ruckman " owns or holds contracts for." And he is to give a deed, conveying the fee simple of the premises; those he owns, and those he holds contracts for.

As to the lands for which he holds contracts, or for which he held contracts at the time the contract was executed. How can this court decree Ruckman to execute deeds conveying the fee simple to lands for which he holds contracts only. A deed for such lands would be a nullity.

The contract is not that Ruckman will assign his contracts for lands within the described territory, but that he will " execute, acknowledge, and deliver to the party of the second part, or to his assigns, a proper deed, for the conveying and assuring to him or them the fee simple of the said premises."

Before there can be any conveyance of such lands decreed, an inquiry must be instituted to ascertain what specific lands Ruckman, at the date of this contract, held contracts for in all parts of the twenty or thirty square miles of territory embraced in the boundaries mentioned in the contract, and then he must be directed to acquire title to those lands, and convey them to King. This, I submit, is a task a court of equity will never undertake. It would involve innumerable side issues as to the validity, force, and effect, of such contracts, whether they are still in force, or have been forfeited, or whether they ever had any binding effect, and whether the parties contracting to sell said lands ever had any title to them, or any power to sell them. It would require that all the parties to such contracts, and all persons interested therein, should be brought in and made parties to this suit.

This part of the lands referred to, therefore, is so vague,

2 E*

indefinite, and uncertain, as to title, that no decree can be made concerning them.

As to the lands Ruckman *owns* within the territory described in the contract.

As to these lands, there is no such certainty of title as will enable the court to make a decree specifying the lands he shall convey.

Before King can have a decree for a conveyance of the lands Ruckman owns within the territory described in the contract, it must be definitely ascertained what lands Ruckman does own in said territory. There is not an acre of land described in either King's original or amended bill, which Ruckman is charged with owning.

Before Ruckman can be decreed to make to King a deed for the lands he owns and holds contracts for, sufficient to convey the fee simple, free from all encumbrances, the title of the whole tract included in the boundaries named in the contract, which embraces some twelve thousand acres, must be ascertained in order to see just how many acres Ruckman owns.

Controversies may arise as to the number of acres Ruckman may own in fee, free from encumbrances. Disputes may arise as to his title to certain portions, and it may be impossible—in fact, it is impossible, in this suit—to determine how many acres Ruckman owns for which he can give the deed required by the contract.

Possibly a bill might be framed so as to enable the court to decree a specific performance of this contract, but the bill in this case is not such a bill.

In support of this position, see *Fry on Spec. Perf.*, § 229, note. The learned author says: " It will be obvious, that an amount of certainty must be required in the specific performance of a contract in equity, greater than that demanded in an action for damages at law. For to sustain the latter proceeding, the proposition required is the negative one, that the defendant has not performed the contract; a conclusion which may be arrived at without any exact

consideration of the terms of the contract; whilst in equity it must appear, not only that the contract has not been performed, but what is the contract which is to be performed."

In *Kendall* v. *Almy*, 2 *Sumner* 278, Justice Story says: "There is no just ground to call upon a court of equity to enforce a specific performance between the original parties themselves, where its terms are not clear, definite, and positive."

In the case of *Lord James Stuart* v. *The London and N. W. Railway Co.*, 1 *De G.*, *M. & G.* 721, which was brought for the specific performance of an agreement, by which the railway company agreed to pay £400 per acre for certain land required by the company for their railway, and for the several portions of land, south of the railway, and £100 in addition for making road passages, archway under the railway; £1250 per acre for seven acres, and £400 per acre for other portions, and £1000 for depreciation of homestead; it was held that the agreement was not sufficiently definite to be enforced. BRUCE, Justice, said, (page 735:) "I am of opinion that the language of the document, in parts of it necessary to be construed and acted upon, if there is to be a decree of any kind for specific performance against the defendant, is too vague, too uncertain, too obscure, to enable the court to act with safety or propriety for any such purpose."

In the case of *The South Wales Railway Co.* v. *Wythes*, 5 *De G.*, *M. & G.* 880, which was on a contract for defendants to build a railway for £290,000, according to specifications to be prepared by engineer, it was held to be too vague and uncertain to be enforced by specific performance.

In *Tatham* v. *Platt*, 9 *Hare* 660, the Vice Chancellor says: "The first term of the agreement is, that the original patentees shall give a license under their patent to the second patentees, £29 per cent. less than to any other licensee. Now, licenses may be granted by patentees, for all or any part of the term, for the whole range of the patent, or for certain districts, for an indefinite number of machines, or for

a limited number. They may be granted in consideration of a sum in gross, of a certain sum per annum, of a fixed sum per machine, or of varying sums, according to the number of machines manufactured or used.". The Vice Chancellor held that in this case no specific performance could be decreed, for uncertainty.

In *Colson* v. *Thompson*, 2 *Wheat.* 336, Justice Washington, in giving the opinion of the court, said : " The contract which is sought to be specifically executed ought not only to be proved, but the terms of it should be so precise, as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy."

Every valid contract must contain a description of the subject matter. And where it is necessary to call in extrinsic evidence, the connection of the subject matter of the agreement and the thing in respect of which specific performance is sought, must be alleged in the bill, and supported by sufficient proof. *Fry on Spec. Perf.,* §§ 209, 210.

It is, however, essential that the description of the subject matter of the agreement should be so definite, as that it may be known with certainty what the purchaser imagined himself to be contracting for, and that the court may be able to ascertain what it is. *Fry on Spec. Perf.,* § 211.

In *Taylor* v. *Gilbertson*, 2 *Drewry* 391, a bill was filed for the specific performance of a contract for the sale of twenty-one acres of land. The purchaser refused a deed because the vendor's title was acquired at a mortgage sale, under a power which contained the following condition, *viz.* that a footpath of the width of fifteen feet should be laid out around the whole of the northern, southern, and western boundaries of the said land. The question was, whether the purchaser would be liable to be compelled to lay out, or cause to be laid out, the footpath around the tract. The Vice Chancellor said : " There is so much uncertainty in the stipulation about

the place where the footpath is to be made, or for what purpose, or for whose use, that I think if Billings filed a bill he could obtain no relief of any kind." See, also, *Price* v. *Griffith*, 1 *De G., M. & G.* 80.

*McKibbin* v. *Brown,* 1 *McCarter* 13. In this case Chancellor Green says (page 17) : "No specific performance of a contract can be decreed in equity, unless the contract be actually concluded, and certain in all its parts. If the matter still rests in treaty, or if the agreement, in any material particular, be uncertain or undefined, equity will not interfere."

In *Lord Walpole* v. *Lord Orford,* 3 *Ves.* 420, Lord Rosslyn says : "I lay it down as a general proposition, to which I know no limitation, that all agreements, in order to be executed in this court, must be certain and defined."

In *Caps* v. *Holt,* 5 *Jones' Eq.* 153, it was held that where the description of land in a memorandum of contract is vague and indefinite, equity will not decree a specific performance. See *Harnett* v. *Yeilding,* 2 *Sch. & Lef.* 549.

From the above authorities, it is clear that the land described in the contract is, in every respect, so vague and uncertain that there can be no specific performance decreed. Nor can this defect be remedied, under the bill filed in this case, by extrinsic evidence; for where it is necessary to call in extrinsic evidence, the connection of the subject matter of the agreement, and the thing in respect of which specific performance is sought, must be alleged in the bill, and supported by sufficient proof. *Fry on Spec. Perf.,* § 210; *Price* v. *Griffith,* 1 *De G., M. & G.* 80.

In this case, there is no clear or definite description of the land sought to be conveyed set out in the bill, and no proof to connect such land, if it had been specifically set out in the bill, with the land contemplated by the contract.

II. There can be no specific performance in this case, because King has not performed on his part.

By the contract, King was to pay $19,900 on the 1st day of June, 1868, one month before the deed was to be deliv-

ered. This he did not do on the 1st day of June, or at any other time before the 1st day of July, when the deed was to be given.

King makes no pretence that he paid this money, but he seeks to excuse himself from paying it on various grounds:

He contends that he was not obliged to pay it before he got his deed, because time is not of the essence of the contract.

Time is of the essence of the contract. 1. Where it is so stipulated in the contract, or where it was the manifest intention of the parties that it should be so considered; and, 2. Where the object of one of the parties would be defeated by delay. 3. Where the party asking for the specific performance has acted in bad faith, or unfairly.

In this case, the simple fact that Ruckman required, and King agreed to pay, $19,900 one month before he got his deed, is at least *prima facie* evidence that the parties intended that time should be of the essence of the contract.

In *Longworth* v. *Taylor*, 1 *McLean* 395, Judge McLean gave a very elaborate opinion upon this question. He says (on page 399): "There can be no doubt but the parties may make time of the essence of the contract; and in no case is it to be considered an immaterial circumstance." On page 400 he says: "It is the province of a court of equity to relieve against penalties and forfeitures; but it would be strange if this relief was extended against the positive stipulation and understanding of the parties. This would be, not to give effect to the contract, but to make a new contract between the parties, contrary to the terms which they themselves had adopted. At law, time is always an essential part of a contract; but in chancery, the court considers it in connection with the circumstances of the case. The rule of law is so inflexible as not to admit of any excuse, however strong, for a failure to perform the contract at the time fixed. But it is otherwise in chancery. Not that chancery disregards time as immaterial, but if the party show that he has been prevented by inevitable accident, or by any justi-

fiable excuse, from performing his part of the contract at the time stipulated, and the other party has suffered no material injury by the delay, the court will not withhold its aid."

Judge McLean further says : " It may be laid down as a rule, established by adjudged cases, and stated in the elementary treatises on the subject, that where a party has failed to execute his part of the contract without a sufficient excuse, and there has been no acquiescence in the delay by the other party, the court will never decree a specific execution of the contract. The party who seeks the court to aid him, must show reasonable diligence in doing, or attempting to do, what he agreed to perform. Nearly a century and a half ago, in the case of *Hayes* v. *Caryll*, 5 *Vin. Abr.* 538, *pl.* 18, it was held that a person was not entitled to specific performance who had trifled or shown a backwardness in performing his part of the agreement."

Time is originally of the essence of the contract, in the view of a court of equity, whenever it appears to have been part of the original intention of the parties that it should be so, and not to have been inserted as a merely formal part of the contract. *Fry on Spec. Perf.*, § 710. It is clearly the rule, that equity will not disregard the manifest intention of the parties. It is only required that they shall make time essential, to induce the court so to construe it. *Fry on Spec. Perf.*, § 711.

Time is of the essence of the contract whenever it appears material to the parties. *Fry on Spec. Perf.*, § 713. When hardship would result from considering time immaterial, the court will incline to consider time as being of the essence. *Fry on Spec. Perf.*, § 719.

In *Earl* v. *Halsey*, 1 *McCarter* 332, it was held that a party who has failed to perform a contract on his part, can have no claim to a specific performance.

In *Steele* v. *Biggs*, 22 *Ill.* 643, it was held that time might be of the essence of a contract, and where that was made clearly to appear, the court would enforce a forfeiture.

In *Young* v. *Daniels*, 2 *Clark (Iowa)* 126, the court said :

"Even where time is not of the essence of the contract, one seeking specific performance, after delay in the performance of his part of the contract, must show good excuse for the delay under the circumstances." See also *Rogers* v. *Mitchell*, 41 *N. H.* 154, where it was held, "that a specific performance of contract will not be decreed in favor of one who is chargeable with any fraud or unfairness in relation to the contract."

In *O'Rourke* v. *Percival*, 2 *Ball & Beatty* 58, it was held that, "unless it appear that the party seeking a specific performance has acted not only fairly, but in a manner clear of all suspicion, equity will not interfere; for, if there be a reasonable doubt on a transaction, the party will be left to his legal remedy for non-performance of a contract."

In *Crofton* v. *Ormsby*, 2 *Sch. & Lef.* 604, it was held that "where the object of one of the parties contracting would be defeated by delay in the execution of it; if the other party delay he shall not afterwards be allowed to insist on performance."

*Newman* v. *Rogers*, 4 *Bro. C. C.* 391, is a case of the sale of a reversion. Part of the terms was, that the money should be paid at a certain time; not being so paid, by default of the vendee, vendor was discharged from his contract.

In *Hayes* v. *Caryll*, 1 *Bro. P. C.* 27, it was held that where a party to an agreement trifles, or shows a backwardness in performing his part of it, equity will not decree a specific performance in his favor.

*Parkin* v. *Thorold*, 11 *E. L. &. Eq. R.* 275, 278, 279, and 280. In this case, the agreement was dated July 25th, 1850, and stipulated that the abstract should be delivered in ten days, and the purchase money paid and the purchase completed on or before the 25th of October. Abstract was delivered August 1st, 1850. The purchaser's solicitor required an inspection of an original paper, which could not be found. On the 21st of October, the solicitor of the purchaser gave the vendor's solicitor notice that unless the

missing paper was produced and the title completed by the 5th November then next, the purchaser would consider the contract at an end. On 1st March, 1851, bill was filed by vendor for specific performance, &c. The question was, whether the vendor, not being able to complete his title at the time specified, could maintain his suit. The Vice-Chancellor says: "The jurisdiction of this court to decree specific performance depends entirely on contract. Consequently, the first point to be ascertained is, what is the contract? This must be decided from the terms of the contract itself. When, therefore, it is once ascertained that the contract of a purchaser is, that he will purchase if a title is made by a given day, but otherwise that he will not, I apprehend, if there is nothing more, that a court of equity cannot, any more than a court of law can, give relief to a vendor who has failed to make a title at the day specified. When, therefore, a contract has been entered into, by which a court of law decides that a purchaser is not bound unless a title be made before a given day, if a court of equity gives relief, it must be, not on the ground that it puts on the words of a contract a construction different from that put on it at law, but because there are grounds collateral to the contract on which it can found a jurisdiction, warranting its interference. What, then, are these grounds? I answer, the conduct of the contracting parties. It is sufficient to say, that the ground on which the court has professed to proceed has always been, that the parties have so acted as to enable it either to give to the original contract a meaning different from its *prima facie* obvious import, or else to say, that the original contract, so far as relates to the time fixed for its completion, has been abandoned, and a new and more extended one, by implication, has been entered into."

The result of this case was, that a specific performance was denied.

*Wells* v. *Smith,* 7 *Paige* 22, was a case where the vendee agreed to build a house on the lot purchased, or pay $1000 of the purchase money as a first payment, on a certain day

before the deed was to be given. He neither built the house nor paid the money. He filed his bill for a specific performance. The specific performance was denied, on the ground that it was the intention of the parties to make the building of the house, or the payment of the money at the time specified, an essential part of the contract. In *S. C.*, 2 *Edw.· C. R.* 78, it was held by the Vice-Chancellor, that equity cannot relieve from the consequences of a condition precedent unperformed.

*Sugden on Vendors, p.* 297 (*8th ed.*).—" We may, therefore, venture to assert that, if it clearly appears to be the intention of the parties that time should be deemed of the essence of the contract, it must be so considered in equity." Also see page 382 : " If it be a condition precedent, it defeats, or rather avoids, the estate, by not permitting the estate to vest until the condition is literally performed."

If, then, in making the contract between Ruckman and· King, it was the manifest intention of the parties that the time for making the first payment of $19,900 on the 1st day of June should be of the essence of the contract, there can be no specific performance decreed in favor of King, if he made default in that payment.

That it was the intention of the parties that the time for the payment of the $19,900 should be an essential of the contract, or a condition precedent to the giving of the deed, is manifest : 1. From the language of the contract. 2. From the evidence.

1. The language of the contract is, that Ruckman agrees to sell his lands for $275 per acre, for which King agrees to pay as follows : $19,900 on the first day of June next, $80,000 on the first day of July next, on delivery of the deed, &c.

2. The evidence shows that this payment of $19,900 on the first day of June was provided for, to be paid at that time for an express purpose ; that the time for the payment of this sum was fixed a month in advance of the giving of the deed, to enable Ruckman to put himself in a position to

give the deed; that this amount was required to complete contracts mentioned in the agreement and pay off mortgages, so he could give a clear title to the property, which he could not prepare himself to do without this money in advance; that his object in stipulating for its payment a month in advance of the time of giving a deed, was to prepare himself with the money to give the deed.

The fact that the time fixed for the payment of the $19,-900 was not inserted in the contract as mere form, but for an object very material to Ruckman, and that the payment of that money at the time fixed was absolutely necessary as a condition precedent, to enable Ruckman to perform the contract on his part, is fully and completely established, and is not even contradicted.

This evidence conclusively shows that the payment of the $19,900 on the 1st day of June, 1868, was very material to Ruckman; that the time when it was to be paid was very essential to him; that it was fixed in advance of the giving of the deed, to enable him to secure his contracts. Ruckman wanted it paid in ten days. King expressed his willingness to pay it within ten days, but objected to putting it in the contract. Ruckman was unwilling to take King's word, but insisted that it should be in the contract. After a good deal of controversy over that point, they compromised on twenty days—the 1st of June.

Can there be any pretence upon this evidence that the time of the payment of the $19,900 was not vitally essential to Ruckman? He informs King that if he wanted time on the $80,000 payment he could have it by paying interest; but the $19,900 he must have, or he would lose his contracts, which would be more damage to him than the money was worth.

I can conceive of no state of facts which would establish more conclusively that the intention of the parties to this contract was, that the time mentioned in this contract for the payment of the $19,900 was of the essence of the contract.

And it is not necessary that it should appear in the writ-

ten contract itself, that the intention of the parties was to make time of the essence of the contract. This may be shown by parol testimony. It was so held in the case of *Nokes* v. *Lord Kilmonry*, 1 *DeG. & Sm.* 444. In that case, statements made by the purchaser's agent at the time of signing the contract, to the effect that time was essential, were admitted as evidence.

The time for the payment of the $19,900 named in the contract, *viz.* June 1st, 1868, if it was not originally of the essence of the contract, was made so by subsequent notice from Ruckman to King.

*Fry on Spec. Perf.*, § 709 : " There are, however, many cases in which time proves a bar to relief. These may be considered under two heads : 1. Those cases where time was originally of the essence of the contract. 2. Where, though not so, it was grafted into it by subsequent notice."

Such notice was given by Ruckman to King. The notice was verbal; but the law does not require it to be in writing. *Fry on Spec. Perf.*, § 729.

King did not make an honest effort to make the tender on the 1st day of June. When Ruckman is in a position to receive the money, and is anxious to receive it, it is too much trouble for King to go to his house, where he is sure to find him; but when he knows Ruckman has it not in his power to give a deed and receive the money, he is fierce for the chance to tender him the money and demand a deed—is willing to pay $500 for the privilege. Does this look like good faith ?

What is necessary to make a good tender ?

Where a party sets up a tender in equity, he will be held to as great strictness as he would be held at law. *Taylor* v. *Jones*, 5 *Monroe* 36.

In a contract to pay money at a time and place certain, the debtor must be ready at the time and place to pay the money; and if he be not there, it is no excuse for him that the creditor was not there to receive the money, if it had been paid. *Ruggles* v. *Patten*, 8 *Mass.* 480. And in such

case, the last convenient hour of the day for transacting business is the legal time of performance. *Savery* v. *Goe*, 3 *Wash. C. C.* 140.

In this case, King was at Voorhis' office a half hour at about twelve o'clock. This was not the last convenient hour of the day for transacting business. King, at half-past twelve o'clock on June 1st, 1868, had two opportunities to go to Ruckman's house by cars, pay this money to Ruckman, and return that afternoon. The whole trip could have been made in two hours. Judge Voorhis informed him that Ruckman was at home, waiting for him, and expecting him to come and pay the money. Miss Emma Hopping says: "Mr. Ruckman went to all the trains to meet Mr. King, on the 1st day of June, except the late train." So it was the easiest thing in the world for him to have found Ruckman that day. Ruckman, the last thing he said to him, as he was leaving the Norwood Hotel, on the 28th of May, told him he would be home all day to receive this money. He therefore knew Ruckman was at home, waiting for him to come there and pay the money.

It was his duty to go there and pay it. For, where money is to be paid, it is the duty of the party who is to pay it to seek the party who is to receive it, in order to make the payment; and whatever may be the understandings or misunderstandings of the parties, the party who seeks the specific performance of a contract, on the ground that he was ready to pay money at the time specified, must show that he has used due diligence to find the party entitled to receive the money, and, if found, has offered it to him. *Goodwin* v. *Holbrook*, 4 *Wend.* 377.

King told his counsel that Ruckman had dodged him and kept out of his way on the 1st of June. Is not this a base and fraudulent pretence, in view of the facts proved? Ruckman, three days before the 1st of June, tells King where he will be to receive the money, to which King makes no objection. Ruckman remains all day at the place named, except when he drives to the depot to meet King. On the

2 F*

very day, King is informed Ruckman is there waiting for him at a time when he can reach him in half an hour. And this he calls dodging him.

If this evidence does not prove bad faith on the part of King, it seems to me that bad faith cannot be proved in any case.

A specific performance of a contract will not be decreed in favor of one who is chargeable with any fraud or unfairness in relation to the contract. *Rogers* v. *Mitchell*, 41 *N. H.* 154.

In the case of *O'Rourke* v. *Percival*, 2 *Ball & Beat.* 58, it was held that unless it appear that the party seeking a specific performance has acted not only fairly, but in a manner clear of all suspicion, equity will not interfere; for if there be a reasonable doubt on a transaction, the party will be left to his legal remedy for non-performance of his contract.

So in *Hayes* v. *Caryll*, 1 *Bro. P. C.* 27, it was held, that " where one party to an agreement trifles or shows a backwardness in performing his part of it, equity will not decree a specific performance in his favor."

But King insists that he again made a tender of the $19,-900 to Ruckman personally on the 4th of June, 1868. And what does this tender consist of? Why, a statement by King to Ruckman that if he would go with him to New York, he could have the money. But Ruckman swears there was no conversation between them that day, in reference to this contract.

III. Does the tender of the $99,900, in the cars, on the first day of July, entitle King to a specific performance, even if he had done all he was required to do in regard to the payment of the $19,900?

I submit it was not such a tender as would sustain his bill.

*First.* Because the bill was filed on the same day the tender was made, within an hour or two after it was made, and Ruckman had no time given him to prepare his deed.

King, when he offered his money and demanded his deed, was bound to wait a reasonable time for the deed to be prepared, and demand it a second time before he was entitled to bring his suit for specific performance.

In *Fuller* v. *Hubbard*, 6 *Cow. R.* 13, it was held that, "where an agreement is to convey land in fee simple on the payment of money, the vendee must not only tender or pay the money, but he must demand a conveyance; and after waiting a reasonable time for it to be made out, must present himself to receive it. *S. C.*, 7 *Cow.* 53.

In *Wells* v. *Smith*, 2 *Edw. C. R.* 78, it was held that, "the party who is to give the deed has the same drawn at his own expense; but under the covenant to convey, he is not bound to prepare the conveyance till the party who is to receive it is in a situation rightfully to demand it. And after such demand, the party is allowed a reasonable time for drawing and executing the deeds, and he is then to hold it in readiness for delivery when called for, and is in no default until a second demand is made. See also *Conolly* v. *Pierce*, 7 *Wend.* 129.

Therefore, they ought not have filed their bill until they had given Ruckman time to have the deed prepared, and get it executed by himself and his wife.

*Secondly.* Because by the contract the sum of $19,900 was to be paid a month in advance of the delivery of the deed; and even though it should appear that Ruckman, on the first of July had lost none of his contracts, that he could then have secured them all, yet he was entitled to the $19,900 for that purpose, and to pay off the mortgages and put himself in position to give a deed. They were, therefore, bound to tender him the $19,900, and wait a month before tendering him the $80,000, and demanding the deed.

But their demand was for a deed on the spot. They refused to give him any money without a deed.

IV. Specific performance cannot in this case be decreed, because it is not in the power of Ruckman to make the title

to the lands mentioned in the contract, or at least to a considerable portion of them.

A specific performance will not be decreed if the vendor could not make a good title at the time when, by the terms of the agreement, he was to deliver a deed. *Richmond* v. *Gray*, 3 *Allen* (*Mass.*) 25; *Ferrier* v. *Buzick*, 2 *Clark* (*Iowa*) 136; *Nicol* v. *Carr*, 35 *Penn. St. R.* 381; *Lewis* v. *Loxham*, 3 *Mer. R.* 429; *Bayly* v. *Tyrrell*, 2 *Ball & B.* 363; *Fry on Specific Performance*, §§ 536, 538.

But they say King will take a conveyance for what Ruckman can convey, and take damages for what he cannot convey. Upon what ground can they ask for damages? Ruckman's inability to convey grows out of King's default in not making the first payment; therefore, King can have no claims for damages.

Is he then entitled to such land as Ruckman can make title to? He is not; for the contract is an entire one. The main inducement which Ruckman had in making it may have been the sale of these very lands for which he held contracts. He might not have been willing to sell the lands for which he held deeds for any such price unconnected with the other lands.

These contracts are for parcels scattered about in different places among Ruckman's other lands. He had very favorable contracts for their purchase, which he lost by reason of King's default. He could not, and cannot now, make title for these lands, until he gets money to pay for them, and gets deeds for them. One great inducement for Ruckman's making this contract with King was to get money to fulfill these contracts which he had for the purchase of these lands. If he is to lose these contracts, he loses the benefit of a large part of the contract he made with King. If he is to convey the lands he owns only, and not those for which he held contracts, he will be required to perform a very different contract from the one he made. He will lose at least $19,710 by the operation.

King, by his delay, not only subjects Ruckman to this loss, but asks that he shall pay him damages for one hundred

and twenty-four acres which he cannot convey. The demand is modest, to say the least.

To decree a conveyance of the land Ruckman can convey, under these circumstances, would inflict a gross injustice upon Ruckman.

In *Crofton* v. *Ormsby*, 2 *Sch. & Lef.* 604, it was held that where the object of one of the parties contracting would be defeated by delay in the execution of it, if the other party delay, he shall not afterward be allowed to insist on performance. *Fry on Spec. Perf.*, § 719; 1 *Story's Eq. Jur.*, § 779.

If a purchaser should insist upon a partial performance, the court will grant relief only upon his compliance with equitable terms.

From the foregoing considerations, I think it clear that there can be no specific performance of this contract decreed in favor of King. His bill, therefore, should be dismissed.

V. Ought this contract to be delivered up to be canceled?

I submit it ought; for, if an instrument ought not to be used or enforced, it is against conscience for the party holding it to retain it, since he can only hold it for some sinister purpose. If it is a deed purporting to convey lands or other hereditaments, its existence in an uncanceled state necessarily has a tendency to throw a cloud over the title. While it exists, it is always liable to be applied to improper purposes. 1 *Story's Eq. Jur.*, § 700; *Duncan* v. *Warroll*, 10 *Price* 31; *Jackman* v. *Mitchell*, 13 *Ves.* 581; *Petitt* v. *Shepherd*, 5 *Paige* 493; *Van Doren* v. *Mayor, &c., of N. Y.*, 9 *Paige* 388; *Bromley* v. *Holland*, 7 *Ves.* 20; *Kemp* v. *Pryor*, *Ibid.* 248; *St. John* v. *St. John*, 11 *Ves.* 535.

In 1 *Story's Eq. Jur.*, § 694, the learned author says: "It is obvious that the jurisdiction exercised in cases of this sort is founded upon the administration of a protective or preventive justice. The party is relieved upon the principle, as it is technically called, *quia timet;* that is, for fear such securities, deeds, or other instruments, may be vexatiously or injuriously used against him, when the evidence to impeach

them may be lost; or that they may throw a cloud or suspicion over his title or interest."

In this case, the contract sought to be set aside, by reason of non-performance by King, ought not to be enforced against Ruckman. That King did not perform on his part, has been abundantly shown in the preceding parts of this brief. Therefore he can have no legal remedy upon the contract, or rights under it. He ought not, therefore, to be permitted to hold it against Ruckman, for, in the language of Justice Story, (*Eq. Jur.*, § 700,) he can only retain it for some sinister purpose.

The whole conduct of King, in regard to this contract, shows that he holds on to it and retains it as a means of annoying, embarrassing, and oppressing Ruckman.

It is apparent, from the considerations already stated, as well as others, that his suit in this court for specific performance was commenced, and is prosecuted in bad faith, for the sole object of embarrassing Ruckman, and by tying up this large property, in which all he possesses is invested, forcing him to buy his peace by paying large sums of money, to free his property from the cloud fastened upon it by the record of this contract. And if he is suffered to retain this violated contract uncanceled, the same bad spirit which has prompted his suit in this court may, and doubtless will, hereafter prompt him to annoy Ruckman with a suit at law upon it, at a time, perhaps, when it may be out of his power to show the real facts of the case.

The bad faith of King, in holding on to this contract, and prosecuting his suit in this court upon it, is manifest. The evidence of it is overwhelming.

I submit the contract should be delivered up to be canceled.

THE CHANCELLOR.

The determination of both causes depends upon the same questions of law and fact. If King is not entitled to a specific performance of the contract, Ruckman is entitled to

have it rescinded and declared void. Counsel, therefore, with great propriety, agreed to have them argued and determined together, upon the same evidence, as if one suit.

By a written contract, under seal, executed by both, made on the 12th day of May, 1868, Ruckman agreed to sell to King a number of tracts of land, in the county of Bergen, and in Rockland county, in the state of New York, describing them as all the lands he owned and held contracts for, in the township of Harrington, east of the old Closter road, and between the Alpine road and the north line of New Jersey; also all his land between the Huyler landing road and the old Closter dock road; also all his land in Rockland county east of the old Closter road; "and also two lots of land situate in Hackensack township, in the county of Bergen;" the whole of the premises containing about two thousand acres, portion of the above bounded by the Hudson river. The price was to be $275 per acre, which King agreed to pay as follows: $100 at the execution of the contract; $19,900 in cash on June 1st, 1868; $80,000 in cash on July 1st, 1868, on delivery of the deed; and the balance to be secured by mortgage, to be paid at times and in instalments specified.

Ruckman agreed, "on receiving such payments and such mortgage at the time and in the manner above mentioned," to execute and deliver, at his own expense, to King a proper deed, with full covenants, to convey the premises in fee, free from encumbrance. The deed was to be delivered at the office of C. H. Voorhis, in Jersey City, July 1st, 1868; and the contract provided, that if either party should fail to comply, he should forfeit and pay to the other the sum of $20,000.

At the drawing of the agreement, Ruckman wanted the $20,000 to be paid, so as to enable him to perform his contracts for the purchase of lands mentioned in the agreement, and while it was being drawn they had considerable discussion about it. Ruckman wanted it fixed for May 22d. King did not want it included in the written contract, which he

wished to be for payment of $99,900, on the 1st of July, and that Ruckman should take his word for the payment of the $19,900 before that time; he said he would pay it in a few days. Ruckman refused to accede to this, but gave to the 1st of June for the payment, and insisted upon that being stipulated in the contract, as it was afterwards written.

On the 28th of May, King applied to Ruckman for an extension of the time of payment of the $19,900 to June 15th, and presented to him for signature a written agreement to that effect, endorsed on the duplicate of the contract taken by King. This Ruckman, decidedly and with violent language, refused to do, and told King that he would hold him to strict payment on that day. Ruckman states that he also told King that he would stay at his own house all day to receive it. King states that Ruckman told him to be at the office of Voorhis to pay it, and that he would be there to receive it. King, accompanied by a man whose name he does not disclose, and which he says he does not recollect, but whom he describes as an old patient, came to the office of Voorhis on the 1st day of June, and produced $19,900, which he counted out before Voorhis. He inquired for Ruckman, and said that he came there with the money for the purpose of making the payment to Ruckman. Voorhis had no authority to receive it, and he did not offer it to Voorhis. King asked Voorhis if Ruckman would be there. Voorhis told him that he would not be there; that he had seen Ruckman a day or two before, and told him, in answer to an inquiry, that as the contract was silent as to the place of payment, it was payable at Ruckman's house, and that Ruckman said he would remain home all day to receive it. King contended that the money was payable at the office of Voorhis, because the deed was to be delivered there. Voorhis told him that it was not, and advised him if he wanted to make a valid tender to go to Ruckman's house, which could be easily reached by a train which would leave at twenty minutes past one, and from which he could return that afternoon. King declined to do this. It was then half past

twelve o'clock. King did not say to Voorhis that Ruckman had promised to meet him there. No further tender of the $19,900 was made. Ruckman testifies that on the morning of the 2d of June, about seven or eight o'clock, he left at King's house, No. 2 Grove street, New York, with a servant girl, a note, stating that as King had failed in his payment, the contract was at an end. This note King says he did not receive, but does not produce the servant girl, who still lives with him, to explain the matter or deny it. King was in the house at that time. On the same morning he went to the Bergen county clerk's office, and had the contract recorded, although he had agreed that he would not have it recorded until after the second payment was made. On the 3d of June, King met and spoke to Ruckman, both in the train and at Ruckman's house. Ruckman, at both times, was in company with H. C. Adams, who, with his son, P. C. Adams, are now concerned with King to the extent of one fifth each in the contract in controversy. P. C. Adams was then concerned and furnished the money with which the second and third payments are claimed to have been tendered. H. C. Adams and Ruckman were then, as Ruckman testifies, bargaining about this property, Ruckman considering that this contract was at an end, and not knowing that Adams or his son had an interest in it. He testifies that he told H. C. Adams so in the car in presence of King, who said he did not consider it was at an end, and that nothing else was said between them on that day about this contract. King on that day called at Ruckman's house, while he and his family and Adams were at dinner. King was asked to dinner, but declined, as he had already dined; Ruckman says that he asked him; King says Ruckman's wife asked him. King says that he asked Ruckman on that day, in the railroad car, why he did not come to the office of Voorhis according to agreement, to receive the money; that Ruckman replied he (King) was a swindler and had no money, and used profane language and opprobrious epithets; that he then offered Ruckman that if he would go back to New York with him

he would pay him the money. King says he did not see Ruckman between June 4th and July 1st. Ruckman says he saw King on June 16th, on the platform at the railroad depot, on his return from the county clerk's office, where he had just ascertained that King had, on June 2d, recorded the contract, and he then refused to shake hands with King, who stretched out his hand, called him a swindling blackguard, and asked him why he had put the contract on record. In their statements of what took place in the car on June 4th, Ruckman and King essentially differ. H. C. Adams, a friend of King, and jointly interested with him in this transaction, was present, seated directly in front of Ruckman and conversing with him. Language of the kind which King states Ruckman used, is not generally said in a mild, low tone, and Adams must have heard, and could not have forgotten it. King could have produced Adams to corroborate his statement, if he relies on it to support his case. And it is very strange that after such language from Ruckman, King should have gone to his house uninvited on the same day, when he had no business to call him there, and enter the room where Ruckman was at dinner with his family and with Adams. I think King, as to this, must be mistaken, and has transferred the language of the interview on June 16th, which he seems to have forgotten, to that of June 4th.

On the 1st of July King went to the office of Mr. Voorhis, accompanied by P. C. Adams and Mr. Bergholz, two persons interested with him in this contract, and by two counselors-at-law, and with $99,900, to make the tender and demand the deed. Ruckman was not there, nor did he go to that office on that day. But at four o'clock all five went to the depot of the Northern railroad, where they found Ruckman seated in a car, on his way home, and tendered him the money, which he refused to receive, accompanying the refusal with profane and opprobrious language. Ruckman considered the contract void, on account of the failure of King to comply with its terms in making the second pay-

ment. King contends that he made the tender of the second payment in compliance with the terms of the contract, and the arrangement made between him and Ruckman; and that even if he did not, in this case time is not of the essence of the contract, and that the court will enforce it, upon his complying with the substantial terms required by it.

There are two questions on the performance : one a question of law, whether, in this case, time was of the essence of the contract; the other a question of fact, whether the office of Voorhis was agreed upon as the place for the second payment. There is also a question of law upon the contract, whether it is sufficiently certain and definite for a court of equity to enforce.

The established doctrine of equity is, that in general time is not of the essence of a contract for the sale of lands. But it is now also settled that in such contracts time may become of the essence of the contract, either by being made so by the contract itself, or from the nature and situation of the subject matter of the contract, or by express notice given, requiring the contract to be closed or rescinded at a stated time, which must be a reasonable time, according to the circumstances of the case.

It was at first held by the English courts of equity that in such contracts time could not be made of the essence of the contract, and that such agreement would not be enforced, any more than an agreement to limit the right of redemption by a mortgagor.

Lord Thurlow, in *Williams* v. *Bonham,* 1 *Sug. on Ven.* 303, where the contract was that if the title should not be made out in three years the agreement should be void, held that the time fixed was only formal, and not of the essence of the agreement.

In *Gregson* v. *Riddle,* (stated in 7 *Ves.* 268, in Sir S. Romilly's argument,) Lord Loughborough, as commissioner of the great seal, and afterwards Lord Thurlow, as Chancellor, held that a stipulation that the agreement should be void if the title was not completed at a given day, was of no validity. And,

in answer to a proposition of Mr. Mansfield, that it would be necessary to insert a provision that it should be void, notwithstanding the decision of the Court of Chancery, Lord Thurlow replied, "that the parties would be just as forward as they were then." Lord Thurlow, without doubt, entertained the idea that equity would not allow the parties to make time the essence of such contract. But he was the only English Chancellor who adhered to that doctrine. Lord Loughborough, who had countenanced it, afterwards, in his decisions, held the contrary. In *Lloyd* v. *Collett*, 4 *Bro. C. C.* 469, he says: "There is nothing of more importance than that the ordinary contracts between man and man should be certain and fixed, and that it should be certainly known when a man is bound and when he is not. It is one thing to say the time is not so essential that in no case in which the day has, by any means, been suffered to elapse, the court would relieve against it and decree performance. The conduct of the parties, inevitable accident, &c., might induce the court to relieve. But it is a different thing to say that the appointment of a day is to have no effect at all, and *that it is not in the power of the parties to contract that if the agreement is not executed at a particular time, the parties shall be at liberty to rescind it.*"

Lord Eldon, in 1802, in *Seton* v. *Slade*, 7 *Ves.* 270, said: "I am inclined much to think, notwithstanding what was said in *Gregson* v. *Riddle*, that time may be made the essence of a contract." This continued to be his settled opinion, as is shown in *Levy* v. *Lindo*, 3 *Mer.* 81; *Boehm* v. *Wood*, 1 *J. & W.* 419, and *Withy* v. *Cottle*, *Turn. & Russ.* 78.

In *Eaton* v. *Lyon*, 3 *Ves.* 692, in 1798, the master of the rolls said: "The doctrine has been formerly carried to a length that became, in some degree, alarming, but undoubtedly in modern times that has been much restrained. If in the purchase of an estate, money has been covenanted to be paid at a given day, if it is not paid at that day, at law no action will lie, but if the party can show that he took the means of paying it, and has been prevented by accidents not

in his power, the court will dispense with the strict performance of it; because, as it was formerly said, time is not of the essence of the contract; *but it may be* of the essence of the contract."

In *Hudson* v. *Bartram*, 3 *Madd.* 447, Sir John Leach says: " Although it was for a long time doubted whether time could be made of the essence of a contract, yet that point has been settled by Lord Eldon. Here, as at law, it may be of the essence of the contract."

In *Hipwell* v. *Knight*, 1 *Y. & Coll. Ex.* 401, Baron Alderson, in delivering the opinion of the court, holds that time may be made the essence of a contract to convey, and that in the case before the court it was made so; and he relies upon the fact that the agreement in that case was changed from three to four months as originally drawn, to show that time was intended to be of the essence of the contract. The Vice Chancellor of England, in the case of *Lloyd* v. *Rippingale*, referred to in the argument of *Hipwell* v. *Knight*, 1 *Y. & C., Ex.* 410, held that express words would make it so. Sir J. Romilly, M. R., in *Honeyman* v. *Marryat*, 21 *Beav.* 14, held that time might be made the essence of a contract. And again, in *Parkin* v. *Thorold*, 16 *Beav.* 65, he says: " Although the dictum of Lord Thurlow, that time could not be made of the essence of the contract in equity, has long been exploded, yet time is held to be of the essence of the contract in equity, only in cases of direct stipulation, or of necessary implication. The cases of direct stipulation are when the parties introduce a clause expressly stating that time is to be of the essence of the contract. The implication is derived from the circumstances of the case, such as where the property is required for some immediate purpose, such as trade or manufacture." Lord Cranworth, when Vice Chancellor, in *Parker* v. *Thorold*, 2 *Sim. N. S.* 1, held that when a purchaser has agreed that he will take a title if made at a given day, but otherwise that he will not; a court of equity cannot, any more than a court of law, give relief to a vendor who has failed to make a title at the day

2 G *

specified, and says: "Lord Thurlow's dictum, that a pur-
chaser could not so stipulate, manifestly rests on no principle,
and has often been repudiated as not truly expressing the
doctrine of this court."

The same doctrine has been adopted and repeatedly ap-
plied in the courts of this country. *Benedict* v. *Lynch*, 1 *Johns-
C. R.* 370; *Wells* v. *Smith*, 7 *Paige* 22; *Mitchell* v. *Wilson*,
4 *Edw. C. R.* 697: *Longworth* v. *Taylor*, 1 *McLean* 399;
*S. C.*, 14 *Pet.* 173.

In the last case, Justice Story, in delivering the opinion of
the court, says: "In the first place, there is no doubt that
time may be of the essence of a contract on the sale of prop-
erty. It may be so by the express stipulation of the par-
ties, or it may arise by implication from the very nature of
the property or the avowed objects of the seller or the pur-
chaser."

I concur in the conclusion arrived at by Sir Edward Sug-
den, in his valuable treatise, *p.* 305, as the result of the de-
cisions: "If it clearly appear to be the intention of the
parties to an agreement that time shall be deemed of the
essence of the contract, it must be so considered in equity."
Mr. Fry, in his treatise on Specific Performance, has arrived
at the same conclusion, §§ 711, 712, and 713.

A time stipulated in an agreement for performance will be
held of the essence, when from the nature of the subject.
matter or the object of the parties, the time of performance
was intended to be such. *Hipwell* v. *Knight*, 1 *Y. & Coll.
Ex.* 416; *Levy* v. *Lindo*, 3 *Mer.* 81; *Coslake* v. *Till*, 1 *Russ.*
376; *Withy* v. *Cottle*, *Turn & Russ.* 78; *Walker* v. *Jeffreys*,
1 *Hare* 341; *Wright* v. *Howard*, 1 *Sim. & Stu.* 190; *Mc-
Kay* v. *Carrington*, 1 *McLean* 50; *Holt* v. *Rogers*, 8 *Pet.*
420; *Young's Adm'r* v. *Rathbone*, 1 *C. E. Green* 224; *Fry,
on Spec. Perf.*, § 713 to 717.

A party will be allowed to show, by parol, that at making
of the contract time was considered as of the essence. *Nokes*
v. *Ld. Kilmorny*, 1 *De Gex & Sm.* 440. And a new agree-

ment extending the time is evidence that they consider the time material. *Wiswall* v. *McGown*, 2 *Barb. S. C.* 270.

I do not think that the provision contained in the stipulation in the contract on the part of Ruckman, which is, that upon receiving such payments and such mortgage, *at the time* and in the manner above mentioned, he will convey, is sufficient of itself to make the time of the essence of the contract; the words, to have that effect, must be clearly indicative of the intention of the parties. But these words, connected with the negotiation and statements at the time of the contract, are sufficient, in my opinion, to make the time of the essence of this contract, and do make it so. Ruckman, at the drawing of the contract, expressly told King that he wanted the $19,900 to enable him to fulfill his contracts for purchase, which were part of the subject matter of the agreement. The time of the payment was changed from May 22d to June 1st, at King's solicitation, and Ruckman resisted all entreaties to put it off, or to accept King's verbal promise instead of the written stipulation. The words of the contract, with these facts, create, in my view, an express stipulation that time is of the essence of the contract. The application for the written extension on the 25th of May, and the tender, or coming ready to tender, the payment at Voorhis' office on the very day, is evidence that King so understood the contract. Again : the subject matter of the contract and the situation of it, make time the essence of this contract. The subject matter was not a dwelling-house, or a manufactory, or a place for trade, or a reversion, which, among others, are held to make time essential, but it was a large number of tracts held and bought for sale, at a period when the prices of lands were high and their stability could not be relied on ; this, of itself, is sufficient to make the stipulation as to time material, and therefore essential. Part of these lands depended on contracts for purchase made by Ruckman. A rise in price might induce those who had sold to him to evade their contracts, if not legally binding, or litigate and delay the fulfillment of such as were legal.

· And, more than all, money was to be paid on these contracts, and the sum to be paid on the 1st of June was relied on for that purpose. Ruckman had a right to rely on it. And the fact that he did so, or stated that he did so, at the making of this contract, of itself would make time of the essence of the contract from the subject matter, without any agreement on the subject. And, in such case, as to the point whether time is of the essence of the contract when made, it is perfectly immaterial whether he actually needed the money, or whether he suffered any loss by the want of it. Where the subject is a dwelling-house, or manufactory, or a reversion, time is material, without regard to the question whether any loss or inconvenience is produced by delay.

In this case, nothing has been done by Ruckman to continue the contract; he has entered into no new negotiation with King. On the 28th of May, he told him he would insist upon payment at the time; on June 2d, he left a notice at King's house; on the 4th of June, he told him the contract was void, and, according to King's testimony, abused him violently, and in his presence proceeded to negotiate a sale with another purchaser.

The next question is that of fact: whether King made the tender required by the contract. The effect of the contract required King to pay the money to Ruckman, and to find him for the purpose of payment, or use reasonable diligence to find him. That is usually held to be accomplished by going to the place of business or to the residence of the payee; but if the parties have agreed upon another place, the place agreed upon would be the proper place to offer the payment. And this places the whole question upon the fact whether Ruckman agreed to meet King at Voorhis' office, and told him to be there to make the payment. Ruckman and King differ in their testimony as to this point. The burden of proof is upon King, and in this situation he would fail; but he has brought witnesses to impeach the character of Ruckman for truth and veracity, and, if successful in this, his testimony would prevail, as nothing is shown against his

own character. But the greatest portion of the testimony for King on this point is such as cannot be regarded. It is evidently founded upon the fact that Ruckman has been guilty of very improper conduct with regard to the cattle of his neighbors, is a troublesome, litigious man, and has made himself unpopular and odious in the neighborhood. Some of the fairest and most respectable witnesses are influenced by the fact that he was fined and judged in contempt by the Circuit Court for offering to treat the jury, in a case of his own, with oysters; and most of the witnesses against his character are persons who have been engaged in litigation with him. Such witnesses are necessarily produced when they alone know or witnessed facts required to be proved; but when selected to give character to a witness, are not of much value. The only testimony allowed in such case is as to the general reputation of the witness impeached, in the neighborhood, for truth and veracity, and that such reputation is generally bad; saying that the witness, from what he knew of his reputation, would not believe him under oath, is not sufficient. I do not think that the testimony on the part of King shows that Ruckman has a general reputation in his neighborhood as a man of untruth or an habitual liar. The evidence is abundant to show that he is a litigious, cross-grained, troublesome, and unjust man. The number of witnesses to sustain his character would be sufficient to neutralize the testimony against him, even if more directly on the point of his character for veracity. If they speak the truth, such character could not have been general.

But laying out of question the testimony of Ruckman, the evidence of Emma Hopping sustains the position taken by him. She swears expressly that when King and Ruckman parted on the evening of May 28th, Ruckman told King that he would remain at home all day to receive this payment. It is true that she is a sister of Ruckman's wife, and may be biased by her connection with him, but this alone should not affect her credibility, as against King swearing directly for himself in his own case. Her testimony is in no

way contradicted by a third witness; her character is on a par with King's, for nothing has been stated against it except insinuations volunteered by counsel. No court or jury should disregard her testimony without some sufficient reason; but the statute provides that the interest of a party when sworn for himself, shall be considered as affecting his credit.

But the facts testified to by Mr. Voorhis, as to the transaction of the 1st of June, materially affect this question. He says that King contended that the money should be paid at his office, because the deed was to be delivered there, and although he told him that Ruckman's house was the proper place for the payment, and that Ruckman said he would stay there for the purpose, King did not mention that Ruckman had appointed that as the place. This silence, four days after he met Ruckman, is in my mind a strong support of the evidence of Emma Hopping. I shall place full confidence in the testimony of Voorhis on this point, and in all matters in this cause. He is, and has been for years, a counselor of this court in good standing; nothing is shown against his character, and I have a right to assume that nothing exists against it; he is contradicted by no one but King; he has no interest in or connection with the cause; there is nothing against him except the railing which counsel, in their zeal for their clients, have inserted as argument in the briefs submitted. These cannot in any way affect him before the court, and if such a witness is not entitled to credit, it is difficult to determine whom to believe.

King being positively contradicted in material parts of his testimony by both Voorhis and Emma Hopping, is himself seriously affected as to his credibility.

By the weight of evidence, I feel bound to believe that Ruckman did not make an agreement with King to meet him at the office of Voorhis, but told him that he would remain home to receive the payment. If there were no agreement, King was bound to seek Ruckman to make the

payment, and the burden is on him to show that Ruckman agreed to meet him at a certain place.

On this view there is no mistake or inevitable accident to excuse King. If he thought at first that the office of Voorhis was the legal place, or that Ruckman ·meant to meet him there, that mistake was corrected by Voorhis in time for him to go to Ruckman's house and make the payment. From his conduct on that day and afterwards, in not making any tender or proffering himself ready to perform the contract, or giving notice that he would insist upon it, Ruckman had a right to infer that he intended to abandon it, and not exert himself to be ready with the title and conveyance on July 1st. And I think such inference is fairly to be drawn by this court in disposing of the cause. These reasons are, in my opinion, sufficient to defeat King's right to a specific performance.

There is another ground taken, that the land to be conveyed is not designated in the contract with sufficient certainty. As to the parts in Harrington township and the county of Rockland, the description is sufficiently certain. It is all the lands owned by Ruckman, or for which he held contracts, within certain boundaries. The maxim is *id certum est quod certum reddi potest.* It can be shown with certainty what lands he owned or held contracts for in those boundaries.

But the last clause seems uncertain. It is simply, " also two lots of land in Hackensack township, county of Bergen." It does not describe them as two lots owned by him, for then if he owned only two lots there it might be rendered certain. This contract would be complied with by his conveying two lots of ten feet square, or two lots containing one thousand acres. Nor can this part be rejected as immaterial, and performance be ordered of the residue, upon compensation. What the lots were, and what the compensation would be, must in that case be ascertained by parol, in face of the statute of frauds. If the two lots were one thousand acres of salt meadow, worth $25 an acre, the compensation to

Ruckman would be large—$250,000. If they were each fifty acres, fronting on the Hudson, worth $2275 per acre, the compensation to King would be $200,000. Either of these suppositions is possible, and it seems to me that this is an uncertainty which must prevent a court of equity from granting relief to King.

I am of opinion that the bill of King must be dismissed with costs, and that Ruckman is entitled to have the contract declared void and given up to be canceled.